BOSTON WATERFRONT DEVELOPMENT CORPORATION *vs.*
COMMONWEALTH.

Suffolk.    December 7, 1978. — August 3, 1979.

Present: QUIRICO, BRAUCHER, KAPLAN, LIACOS, & ABRAMS, JJ.

*Harbors. Real Property*, Harbors, Wharf, Grant, Restriction, Littoral
    property.

History of the development of legal rules applying to ownership of
    shore land.  [631-637]
Discussion of the "Lewis Wharf statutes."  [637-641]
Having the right to build a wharf over tidal land does not necessarily
    mean having title to that land.  [641-644]
Title to land lying below the low water line is not equivalent to title
    to upland.  [644-646]
Pursuant to the "Lewis Wharf statutes," a corporation held title in fee
    simple to certain land lying below low water line, but subject to the
    condition subsequent that it be used for the public purpose for
    which it was granted.  [646-653] BRAUCHER, J., dissenting.

PETITION filed in the Land Court on March 19, 1964.
The case was heard by *Randall*, J.

After review by the Appeals Court, the Supreme Judi-
cial Court granted leave to obtain further appellate re-
view.

*Arnold P. Messing* for the Boston Waterfront Develop-
ment Corporation.

*Howard R. Palmer*, Assistant Attorney General (*Dean
P. Nicastro*, Assistant Attorney General, with him) for
the Commonwealth.

*Loring P. Jordan, Jr., & William S. Rosenberg*, for The
Massachusetts Conveyancers Association & another,
amici curiae, submitted a brief.

*Stephen H. Oleskey & Timothy H. Gailey,* amici curiae, submitted a brief.

QUIRICO, J. This case arises from a dispute between the Boston Waterfront Development Corporation (BWDC) and the Commonwealth over the ownership of a small parcel of land at the end of a wharf extending into Boston Harbor. To resolve this dispute we must consider in historical perspective the allocation of rights among private parties, the Commonwealth, and the public to use, own and enjoy one of the Commonwealth's most precious natural resources, its shore.

In 1964, the Commercial and Lewis Wharf Corporation, predecessor to BWDC, brought a petition pursuant to G. L. c. 185, § 1, to register title to a certain parcel of waterfront land under Lewis Wharf in the city of Boston, consisting of areas A, B, C and F on an accompanying plan, a copy of which is included as an appendix to this opinion. After prolonged negotiations, BWDC, as substitute petitioner, and the Commonwealth stipulated that BWDC was the owner in fee simple of area A, that is, the land shoreward of the historic low water mark;[1] and that BWDC would withdraw without prejudice its petition to register areas C and F. The only area remaining in dispute, area B, is the area between the low water mark and the currently existing sea wall. This area is covered by the seaward end of a wharf constructed over filled land, partly occupied by the corner of an ancient granite building now renovated into modern shops, offices, restaurants, and condominiums. The parties agreed that the only issue to be decided by the Land Court was whether

---

[1] High and low water marks have traditionally played a critical role in defining the rights of tideland owners. The low water mark referred to here is that which was determined in 1846 by one George R. Baldwin, who was appointed by this court for that purpose. His plan showing the lines of high and low water was accepted by both parties and Chief Justice Shaw as authoritative in *Wheeler* v. *Stone,* 1 Cush. 313, 323 (1848). See also 1868 Sen Doc. No. 302, which accepts the accuracy of the Baldwin lines.

"the Petitioner obtained fee simple title to the soil beneath the fill" as a consequence of certain acts of the Legislature in the early Nineteenth Century known collectively as the "Lewis Wharf statutes." St. 1832, c. 102; St. 1834, c. 115; St. 1835, c. 76; and St. 1840, c. 18. The Land Court ruled that BWDC's predecessor in title had obtained fee simple title, and entered a decree registering the land.

The Commonwealth appealed to the Appeals Court, the parties submitting an agreed statement of the case pursuant to Mass. R. A. P. 8(d), as amended, *post* 924 (1979). Once again the issue framed was whether the petitioner had obtained fee simple title to the soil beneath the fill of area B as a result of the "Lewis Wharf statutes." The Appeals Court, in an opinion written by Goodman, J., agreed with the Land Court that BWDC's predecessors had been granted fee simple title to the disputed land, but added that it was held "subject to a condition subsequent that it be used in accordance with the purpose expressed in those statutes." *Boston Waterfront Dev. Corp.* v. *Commonwealth*, 6 Mass. App. Ct. 214, 228 (1978). We agree with the Appeals Court's decision.

Throughout history, the shores of the sea have been recognized as a special form of property of unusual value; and therefore subject to different legal rules from those which apply to inland property. At Roman law, all citizens held and had access to the seashore as a resource in common; in the words of Justinian, "they [the shores] cannot be said to belong to anyone as private property." Institutes of Justinian, 2.1.1-2.1.6 cited in Note, The Public Trust in Tidal Areas: A Sometime Submerged Traditional Doctrine, 79 Yale L.J. 762, 763 (1970), see David A. Rice, Final Report: A Study of the Law Pertaining to the Tidelands of Massachusetts, 1971 House No. 4932, at 17-18. With the collapse of the Roman Empire and its ordered system of law, public ownership of tidal areas gave way to a chaos of private fiefdoms. Under the English feudal law which emerged, ownership of the shore was

claimed by the Crown, which in turn had the power to grant out portions of its domain to the exclusive ownership and use of the private subjects who in fact possessed it. See Fraser, Title to the Soil under Public Waters — a Question of Fact, 2 Minn. L. Rev. 313, 315-322 (1918).

The conflict between king and citizens that preceded the Magna Charta concerned, among other things, opposition to this absolute power of the Crown to grant private rights in the shore, particularly as these rights interfered with the free navigation which was so essential to the rising commercial classes. Note, The Public Trust in Tidal Areas, *supra* at 765. After Magna Charta, the competing interests were accommodated by a legal theory that divided the Crown's rights to shore land below high water mark into two categories: a proprietary jus privatum, or ownership interest, and a governmental jus publicum, by which the king held the land in his sovereign capacity as a representative of all the people. *Shively v. Bowlby*, 152 U.S. 1, 11-14 (1894). *Commonwealth* v. *Alger*, 7 Cush. 53, 90 (1851). *Commonwealth* v. *Roxbury*, 9 Gray 451, 482-484 (1857). This latter interest the Crown could not convey into private hands, since it was "held as a public trust for all subjects and their free exercise of the common rights of navigation and fishery . . . ." Rice, *supra* at 18. The jus publicum was eventually understood to be under the control of Parliament, while the jus privatum belonged to the king. Since neither party held all the rights to the shoreland, neither could convey it with free and clear title into private hands. See *Martin* v. *Waddell*, 41 U.S. (16 Pet.) 367, 410 (1842). These arrangements restored to the public some of the rights to use of shoreland which had been guaranteed by public ownership in Roman times.

These legal concepts are more than mere historical curiosities, because they were very much in the minds of the Nineteenth Century legislators and judges who oversaw the development of Boston Harbor. When we attempt to interpret the significance of the legislative grants of

rights in the Boston shoreline contained in the "Lewis Wharf statutes," we must remember that they were written by men who were familiar with the English common law history of the shore. The Supreme Judicial Court frequently referred in its opinions to the notion that the Crown's ownership of shoreland, from which all Massachusetts titles historically derived, was "in trust, for public uses." *Commonwealth* v. *Alger*, 7 Cush. 53, 65, 90 (1851). *Commonwealth* v. *Roxbury*, 9 Gray 451, 482-483 (1857). *Weston* v. *Sampson*, 8 Cush. 347, 352 (1851). *Barker* v. *Bates*, 13 Pick. 255, 259 (1832). Legislative awareness of this historical background is evident, for example, in an 1850 report of the Senate Joint Committee on Mercantile Affairs and Insurance concerning the flats in Boston Harbor, in which the committee stated: "By the law of all civilized Europe, before the feudal system obtained in England, there was no such thing as property in tide waters. Tide waters were res omnium, that is, they were for the common use, like air and light. . . . In England, the fiction of a fee in the Crown, and the control of the trust in Parliament, we understand to have been a mode, suited to the times and the genius of the feudal law, for insuring to the State the control over tide-waters. The Commonwealth succeeds to this right of control." 1850 Sen. Doc. No. 119, at 2.

The first English settlers of what is now Massachusetts obtained their titles to land under grants from James the First and Charles the First which passed to the organized companies chartered to settle Plymouth and Massachusetts Bay Colonies "absolute property in the land within the limits of the charter, the power of making laws for the government of the colony, and full dominion over all the ports, rivers, creeks, and havens, &c. in as full and ample a manner as they were before held by the crown of England." *Commonwealth* v. *Charlestown*, 1 Pick. 180, 182 (1822). The jus privatum/jus publicum distinction in regard to shoreland property was carried over to the new world, so that the company's ownership was understood

to consist of a jus privatum which could be "parcelled out to corporations and individuals ... as private property" and a jus publicum "in trust for public use of all those who should become inhabitants of said territory ...." *Commonwealth* v. *Roxbury,* 9 Gray 451, 483-484 (1857).[2]

Land ownership in the colony was governed by the English common law, "which our ancestors brought with them, claiming it as their birthright." *Storer* v. *Freeman,* 6 Mass. 435, 437 (1810). Owners of land bounded by the sea or salt water "could not, by such boundary, hold any land below the ordinary low water mark; for all the land below belonged of common right to the king." *Id.* at 437. Certain public rights to the use of such land were guaranteed by the 1641 colonial "Body of Libertyes" which provided that "Every Inhabitant who is an householder shall have free fishing and fowling in any great ponds, bayes, Coves and Rivers ... unless the freemen of the same Town or the General Court have otherwise appropriated them." The Book of the General Lawes and Libertyes 50 (1649).

As to the land between high and low water marks, however, commonly referred to as the flats, the Massachusetts colonial law and practice deviated from the English law. Chief Justice Parsons explained this legal devel-

---

[2] In *Martin* v. *Waddell,* 41 U.S. (16 Pet.) 367, 411-413 (1842), Chief Justice Taney addressed this same distinction in regard to the ownership of shorelands in colonial New Jersey. Asking whether the grant of tidal lands from the king to the founders of New Jersey was "intended to be a trust for the common use of the new community ... or private property to be parcelled out and sold to individuals...," he concluded the former, since the land passed "upon the same trusts" that it was subject to in the hands of the king. Chief Justice Taney reveals the depth of feeling about private ownership of shoreland which existed in this period (the period of the "Lewis Wharf statutes") when he writes: "the men who first formed the English settlements, could not have been expected to encounter the many hardships that unavoidably attended their emigration to the new world, and to people the banks of its bays and rivers, if the land under the water at their very doors was liable to immediate appropriation by another as private property ...." *Id.* at 414.

opment very artfully in his opinion in *Storer* v. *Freeman,*
*supra* at 437: "When our ancestors emigrated to this
country, their first settlements were on harbors or arms
of the sea; and commerce was among the earliest objects
of their attention. For the purposes of commerce,
wharves erected below high water mark were necessary.
But the colony was not able to build them at the public
expense. To induce persons to erect them, the common
law of *England* was altered by an ordinance, providing
that the proprietor of land adjoining on the sea or salt
water, shall hold to low water mark, where the tide does
not ebb more than one hundred rods, but not more where
the tide ebbs to a greater distance."

Accord, *Shively* v. *Bowlby, supra* at 18-19; *Common-
wealth* v. *Charlestown, supra* at 183-184 ("The desire and
necessity of wharves, quays or piers was soon felt by in-
dividuals and the community, and the occupation of flats
became indispensible. The government then to encourage
these objects, and to prevent disputes and litigations,
transferred its property in the shore of all creeks, coves,
and other places upon the salt water, where the sea ebbs
and flows, giving to the proprietor of the land adjoining
the property of the soil to low water mark, where the sea
does not ebb above one hundred rods"). *Opinion of the
Justices,* 365 Mass. 681, 685 (1974). ("In the 1640's, in
order to encourage littoral owners to build wharves, the
colonial authorities took the extraordinary step of ex-
tending private titles to encompass land as far as mean
low water line or 100 rods from the mean high water line
. . . .")

This alteration of common law ownership rules, per-
haps originally just a matter of colonial custom, found
official expression in the colonial ordinance of 1647,
which declared that landowners adjoining "all *Creeks,
Coves,* and other places, about and upon *Saltwater* . . .
shall have propriety to the low water mark . . . [p]rovided
that such proprietor shall not by this liberty, have power
to stop or hinder the passage of boates or other vessels, in

or through any Sea, Creeks, or Coves, to other mens houses or lands." The Book of the General Lawes and Libertyes 50 (1649). "The main object of the Massachusetts Colony ordinance has always been understood to be to induce the erection of wharves for the benefit of commerce." *Commonwealth* v. *Roxbury, supra,* note at 503, 515.[3]

Nineteenth Century opinions of the Supreme Judicial Court construed this colonial ordinance as granting "only a qualified property" in the flats to the upland owner, qualified by the public right of navigation. *Commonwealth* v. *Charlestown,* 1 Pick. 180, 184 (1822). Thus, for example, in the *Charlestown* case, *supra* at 184, the court held that "even the proprietor of the flats can lawfully erect nothing upon them, which will obstruct or hinder such passage [of boats]." Only the Legislature, according to the court, could authorize interference with the right of public passage, when necessary for a greater public good such as a bridge, dam, or mill: "[I]t is an unquestionable principle of the common law, that all navigable waters belong to the sovereign, or, in other words, to the public; and that no individual or corporation can appropriate them to their own use, or confine or obstruct them so as to impair the passage over them, without authority from the legislative power." *Commonwealth* v. *Charlestown, supra* at 185-186, quoting *Arundel* v. *M'Culloch,* 10

---

[3] This is an extensive note immediately following the opinion in *Commonwealth* v. *Roxbury,* but not a footnote of the court thereto. The note appears to have been written by Horace Gray, Jr., who was then the Reporter of Decisions for this court, and who served in that position from 1854 to 1860. Thereafter he served as an Associate Justice of this court from 1864 to 1873, and as Chief Justice from 1873 to 1882. He resigned as Chief Justice upon his appointment to the United States Supreme Court where he served from 1882 to 1902. His note, covering more than twenty-five printed pages, is a carefully annotated review of the development of the law relating to rivers, ponds and the seashore, and to lands abutting thereon, starting with the grant of November 3, 1620, and continuing to the date the note was written, in 1857.

Mass. 70 (1813). Although the colonial ordinance extended ownership of land in fee to low water mark, this ownership always had strings attached: "It is true individuals may acquire the right by grant or prescription, or under the ordinance of 1641, to occupy flats with wharves and stores, but this is always on condition that the navigation of the stream be not materially impaired . . . ." *Kean* v. *Stetson,* 5 Pick. 492, 495 (1827). See also *Drake* v. *Curtis,* 1 Cush. 395, 413 (1848); *Commonwealth* v. *Alger, supra* at 70-79; *Weston* v. *Sampson, supra* at 354; *Crocker* v. *Champlin,* 202 Mass. 437, 441 (1909).

It is against this background of historical and legal developments that the first proprietors of Lewis Wharf, predecessors in title to BWDC, built their wharf on Boston Harbor. A Lewis Wharf appears on Carleton's 1797 Plan of Boston (reproduced in 4 Winsor, Memorial History of Boston 26 [1883]); by 1832, when the first of the "Lewis Wharf statutes" was passed, it was a long established feature of the harbor scene. Statute 1832, c. 102, declared that the "proprietors" of Lewis Wharf "are hereby authorized and empowered to extend and maintain the said wharf into the harbor channel," as far as to a described line which was seaward of low water mark, "*Provided,* that so much of said wharf, as may be constructed in said channel [i.e., below low water], shall be built on piles . . . ." Two years later, these same proprietors and their associates were incorporated by an act of the Legislature into the "Lewis Wharf Company, with power to hold, in fee simple, or otherwise, all or any part of that real estate" lying within certain bounds around Lewis's and Hancock's Wharf, and were authorized within that area to "construct docks and wharves, lay vessels . . . , and receive dockage and wharfage therefor, erect buildings, lay out streets and passage ways, and improve and manage said property, as to them shall seem expedient: "*provided,* that nothing herein contained shall be understood as authorizing said corporation in any way to interfere with the legal rights of any person or persons

whomsoever." St. 1834, c. 115, § 1. A year later, this same Lewis Wharf Company was "authorized and empowered, to purchase and hold" the "land, wharf, and flats" of neighboring Snow's Wharf as well, "with all the powers and privileges, and subject to all the duties and requisitions" stated in the 1834 Act. St. 1835, c. 76.

This series of statutes was but one of a multitude of similar acts passed in the 1810's, 1820's and 1830's granting various parties wharf privileges in Boston Harbor. See, e.g., St. 1815, c. 171; St. 1816, c. 23; St. 1829, c. 92; St. 1830, c. 96 and c. 113; St. 1832, c. 57; St. 1833, c. 35; St. 1836, c. 45. The wharfing statutes are themselves but one example of a larger class of statutes in which the Massachusetts Legislature granted property and privileges to private turnpike companies, canal companies, bridge and dam building companies, etc. as a means of stimulating private investment in economic development. See, e.g., St. 1822, c. 78; St. 1825, c. 150; St. 1828, c. 54; St. 1835, c. 111. The theory was that such "undertaking[s], although commenced with a view to the private advantage of the stockholders, promised to be of immense and certain utility to the State." *Boston & Roxbury Mill Corp.* v. *Newman*, 12 Pick. 467, 481 (1832).

This convergence of private profit and public benefit stimulated such rapid commercial development in Boston Harbor that by 1835 the Legislature perceived a need for regulation of further harbor development. It passed a resolution appointing three commissioners to survey Boston Harbor and to define "such lines as they shall think expedient to establish, beyond which no wharves shall be extended into and over the tide waters of the Commonwealth . . . ." Res. 1835, c. 40. These commissioners submitted their report in 1837, establishing a line beyond which wharves could not be extended into the harbor, and stating "*We leave all legal rights of private property as we found them*, only prescribing limits we think it expedient to establish beyond which they [wharves] cannot go fur-

ther into the channel or tide-water, for the general good and preservation of the harbor." Report of the Commissioners for the Survey of Boston Harbor, 1837 Sen. Doc. No. 47, at 16 (emphasis supplied). This Commissioners' line was officially adopted by St. 1837, c. 229. In 1840 the Legislature gave the Lewis Wharf Company authority to extend their wharves into the harbor channel as far as this Commissioners' line, provided they were built upon piles. St. 1840, c. 18. This line lies to the east of Area B.

The question we must decide is whether the above statutes granted the Lewis Wharf Company a fee simple title to the land underneath the wharves which it was authorized to extend below low water mark. Preliminarily, we point out that there is nothing in the actual language of these statutes making a grant of the title to land. The statutes give authority to "extend" wharves, power to "hold" real estate, to "improve" property, but nowhere do they explicitly convey land. Following the long-established principle of statutory construction that "in all grants, made by the government to individuals, of rights, privileges, and franchises, the words are to be taken most strongly against the grantee . . ." (*Cleaveland* v. *Norton*, 6 Cush. 380, 383-384 [1851]; *Prudential Ins. Co.* v. *Boston*, 369 Mass. 542, 547 [1976]; *Home for Aged Women* v. *Commonwealth*, 202 Mass. 422, 436 [1909]; *Proprietors of Mills on Monatiquot River* v. *Commonwealth*, 164 Mass. 227, 234 [1895]; *Commonwealth* v. *Roxbury*, 9 Gray 451, 492 [1857]), these statutes on their face do not appear to sustain the petitioner's claim.[4] However, a decision resting

___

[4] The petitioner's argument that this rule of statutory construction does not apply to the "Lewis Wharf statutes" rests on various distinctions between the many other cases in which it has been applied, and this case. We believe, however, that it is the spirit rather than the letter of this "rule" which is critical; agreeing with Chief Justice Shaw that where private grantees are claiming to have been granted "a portion of that public domain, which the government held in a fiduciary relation, for general and public use," *Commonwealth* v. *Roxbury*, 9 Gray 451, 492 (1857), the "rule" applies a fortiori.

on the bare words of the statutes would ignore over 100 years of judicial history interpreting similar grants. It is to examination of this precedent that we now turn.

The understanding of these cases concerning shore property is enhanced by following the historical development of Boston Harbor through the mid-Nineteenth Century. Legislative documents describe increasing concern with encroachment upon the harbor, as wharf property became very valuable, and great portions of the harbor were reclaimed as filled land. 1837 Sen. Doc. No. 47. 1847 Sen. Doc. No. 25. 1850 Sen. Doc. No. 3. 1851 House Doc. No. 106. Investors who speculated in harbor property pressured the Legislature to grant away the Commonwealth's flats to private owners. An 1850 report by the harbor commissioners considered whether or not to adopt such a policy and recommended against it, saying "The demand for land is, in a great degree, an individual demand, the demand of companies engaged in speculations; while the demand for water is a demand of the public, — a demand of commerce, in which the State and nation have a deep and vital interest." 1850 Sen. Doc. No. 3, at 28. The continuing pressure for development caused the Legislature in 1866 to create a permanent Board of Harbor Commissioners whose approval would be required for any proposed building or filling on the tidelands. (St. 1866, c. 149.) In 1869, the Legislature declared that all "authority or license" thereafter granted to build, fill or enclose tidelands was to be "revocable at any time, at the discretion of the legislature. . . ." (St. 1869, c. 432, § 1). One of petitioner's arguments is that the passage of this 1869 legislation demonstrates that prior to 1869, such grants were not revocable licenses.[5]

---

[5] But note that § 4 of St. 1869, c. 432, reads: "Nothing in this act . . . shall have any effect whatever on the construction of grants heretofore made by the Commonwealth, as indicating whether or not a right of revocation attach to such grants."

This question was first addressed in *Fitchburg R.R.* v. *Boston & Me. R.R.*, 3 Cush. 58 (1849), an action by Fitchburg for compensation for the Boston & Maine's taking of a strip of their wharf which lay below the low water line. Fitchburg had been authorized to extend their wharf below low water by a statute closely analogous to St. 1840, c. 18, of the "Lewis Wharf statutes" St. 1841, c. 35. The Boston & Maine contended that this authorization was but a revocable license, and that when the Legislature later authorized it to pass its rail line over the same land, this was an implied revocation of any of Fitchburg's rights. The court rejected this argument holding that "the statute of 1841 operated as a grant to the Charlestown Wharf Company [the predecessor of Fitchburg], and not as a mere revocable license . . . ." *Id.* at 87. This interpretation was upheld in regard to other, very similar wharfage statutes (St. 1851, c. 26, and St. 1855, c. 481, § 1) in *Bradford* v. *McQuesten*, 182 Mass. 80, 81 (1902), and *Treasurer & Receiver Gen.* v. *Revere Sugar Refinery*, 247 Mass. 483, 489 (1924), the court stating in the latter case that such a statute "operated as a legislative grant subject to the terms and conditions therein set forth, and not as a mere revocable license." See also *Richard T. Green Co.* v. *Chelsea*, 149 F.2d 927, 931-932 (1st Cir. 1945).

We see no reason to upset these interpretations; we agree that the "Lewis Wharf statutes" were grants rather than revocable licenses; but the salient question is: grants of what, and under what conditions? Examination of this question convinces us that what was granted was not a fee simple absolute title to the soil.

1. *Having the right to build a wharf over tidal land does not necessarily mean having title to that land.*

Past decisions of this court have been inconsistent in their treatment of the relationship between wharfing privileges and ownership of the soil under the wharf. In *Boston* v. *Richardson*, 105 Mass. 351, 360-361 (1870), this court stated that "The title in the soil, and the right to wharf over and inclose flats, or the power to regulate such

wharfing, are not necessarily interdependent." The court pointed out that in many States, shoreland owners have a right to build wharves out to low water even without having title to the soil under them, and that such a right may have existed in colonial Massachusetts before the ordinance of 1647. The court does speculate that "[s]ince the general policy of granting the title in the flats to private proprietors, subject to the public right of navigation, has been manifested by the ordinance of 1647, a grant from the legislature of the right to erect a wharf over flats belonging to the Commonwealth *may* indeed carry with it a title in the flats" (emphasis supplied), *id.* at 362, but does not decide this point. The issue in the case was whether the city of Boston or certain neighboring private parties owned a disputed area of flats; the courts stated that the fact that the city had the authority to regulate wharfing in that area did not prove that it had title to the land.

In *Commercial Wharf Co.* v. *Winsor*, 146 Mass. 559, 563 (1888), the court's language also suggests a distinction between the authority to extend wharves and title to the soil. Commenting on the statutes (similar to the "Lewis Wharf statutes") which empowered the parties in that case to extend their docks below low water to the 1837 Commissioners' line, the court stated: "The establishment of the new harbor line did not carry out low-water mark, and the line of private ownership remained as it had been, at the old line of the harbor channel. The only private right either party had within the harbor channel was that given it by the statutes authorizing the extension of its wharf, namely, a right to extend into the harbor channel, within certain lines, a wharf built on piles . . . ." An indirect, and somewhat cryptic hint that being authorized to extend one's wharf below low water was not equivalent to being granted title to the land underneath it occurs in *Gray* v. *Bartlett*, 20 Pick. 186, 194 (1838), where Chief Justice Shaw, who wrote many of the important decisions explicating rights to tideland property,

comments, in dicta, that the part of the land under the plaintiff's wharf which is *below* low water is "a part of the public domain, and owned by neither of these parties."

In *Nichols* v. *Boston*, 98 Mass. 39, 42 (1867), on the other hand, the lessee of Lincoln's Wharf was held to have *title* to a dock lying below low water. The court commented that "the legislature may grant the title in the soil, *or* the right to build wharves thereon, below as well as above low water mark" (emphasis supplied), leaving unclear how and when this distinction operated. In *Attorney Gen.* v. *Boston Wharf Co.*, 12 Gray 553, 562-563 (1859), a statute authorizing the Boston Wharf Company to extend its wharves out to the Commissioners' line, below low water, was said to give that company ownership of, and "good title" to the flats within the boundaries described. In *Commonwealth* v. *Boston Terminal Co.*, 185 Mass. 281, 283-284 (1904), the court asserts, in dicta, that the Legislature can "pass its interest . . . in lands that are below extreme low water mark" free of any public trust, so that when these lands are "filled by the grantee [it] will extinguish the right of user by the public." The holding of *Boston Terminal*, however, is that the railroad must pay the Commonwealth for Commonwealth lands it acquired through the eminent domain power granted to it by the Legislature, since "[i]t cannot be held that the State, any more than an individual, parts with title in fee to real estate by implication alone; and if its land is to be granted in aid of a private corporation, even if the public may thereby be more largely accommodated, this intention must clearly appear by the express words of the act under which the grant is claimed." *Id.* at 287.

A trio of cases interpreting St. 1806, c. 18, which gave owners of land in New Bedford a right to extend their wharves below low water mark, leaves unclear the nature of the title granted by such a statute. In *Haskell* v. *New Bedford*, 108 Mass. 208, 209 (1871), the court refers to the plaintiff as "the owner in fee" of even that portion of the land and wharf below low water; and in *Hamlin* v.

*Pairpoint Mfg. Co.*, 141 Mass. 51, 57 (1886), the court construes the statute "as a legislative grant to the owners of lots of an *interest in the soil* between their lots and the channel of the river" (emphasis supplied). But the court also takes care to point out that "[w]hether it [the statute] gave them an absolute fee without any restrictions . . . it is not necessary to consider in this case. The act certainly gave them a possessory *title for the purpose of building wharves*, sufficient to enable them to maintain trespass if their rights are invaded" (emphasis supplied). In *Hastings* v. *Grimshaw*, 153 Mass. 497, 500 (1891), which cites to *Hamlin, supra,* saying it is again unnecessary to decide whether the statute of 1806 granted an absolute fee, the plaintiff's ownership interest is no longer described as a fee; rather he is called "the owner of the locus [below low water] described in the declaration, *so far as there could be private ownership of that property*" (emphasis supplied).

Read together, these cases establish no clear doctrine about the nature of the title, if any, granted to private owners by legislative acts giving authority to wharf below low water line. The only consistent theme appears to be that in any event this title is somehow in a special category, different from ordinary fee simple title to upland property. This difference is explored more fully below.

2. *Title to land lying below the low water line is not equivalent to title to upland.*

In *Commonwealth* v. *Alger*, 7 Cush. 53 (1851), a wharf owner on Boston Harbor extended his wharf so that a triangular piece at the end of it lay *above* low water mark, but below the harbor commissioners' line below which no wharves were to reach. The Commonwealth indicted him for breaching the Commissioners' line; he answered that he owned the property down to low water mark and that the Commonwealth could not deprive him of the use of it without compensation. Chief Justice Shaw's opinion, after an exhaustive review of the relevant history and

case law, concluded that by virtue of the ordinance of 1647 Alger held the land between high and low water "in fee, subject to a reserved easement [for navigation]." *Id.* at 81. However, the court also held that it was competent for the Legislature, without compensation, to deprive Alger of the use of part of it, since "real estate . . . situated on the sea-shore, separating the upland from the sea, to which the public have a common and acknowledged right, . . . should be held subject to somewhat more restrictive regulations in its use, than interior and upland estate." *Id.* at 95. Similarly, in *Crocker* v. *Champlin*, 202 Mass. 437, 442 (1909), this court denied the plaintiff shoreland owner's claim for compensation for the flooding of his flats by the Charles River Basin Commission, stating that if the Commonwealth flooded land above high water mark, compensation would have to be made, but that "the ordinance creating private property in flats reserved this right for the benefit of all the people."

In two cases in which private parties have sought to register title not, like BWDC, to land *below* low water mark, but to land between high and low water marks, this court has held that their title could only be registered with certain restrictions. In *Butler* v. *Attorney Gen.*, 195 Mass. 79, 84 (1907), a petitioner sought to register title to an unimproved beach on the shore at Gloucester. The Attorney General wished the Land Court to declare petitioner's title subject to certain reserved rights of the public. This court concluded that the public did not have a right to use petitioner's beach for bathing purposes, as the Attorney General had, among other things, requested, but held that "[w]e are of opinion that a decree should be entered that the premises are held by the petitioners in fee, subject, however, as to that portion between high and low water mark, to the easement of the public for the purposes of navigation and free fishing and fowling, and of passing freely over and through the water without any use of the land underneath, wherever the tide ebbs and flows." This identical language was adopted in *Michael-*

*son* v. *Silver Beach Improvement Assoc.*, 342 Mass. 251, 261 (1961), in registering petitioner's title to shoreland on Wild Harbor.[6]

If a restriction on the title is appropriate for land *between* high and low water mark, it is even more necessary for land *below* low water mark, which has traditionally been held to be inviolably committed to the public domain. Even assuming that the "Lewis Wharf statutes," like other statutes of its type, were not revocable licenses, and did grant an irrevocable right to the use of the described land for wharfage and related purposes, this does not lead to the conclusion that BWDC owns the soil at issue in unconditional fee simple title. The land was granted to BWDC's predecessors to fulfil a public need for commercial development of Boston Harbor, and the purpose of the grant, as explained below, is inextricably related to BWDC's ownership of the land.

3. *The land below low water line can be granted by the State only to fulfil a public purpose, and the rights of the grantee to that land are ended when that purpose is extinguished.*

In 1869, the Illinois Legislature granted the Illinois Central Railroad in fee simple all land within a one mile by one mile square of the shoreline of Lake Michigan. In 1873, repenting its excessive generosity, the Legislature attempted to repeal this grant. The railroad challenged the validity of the attempted revocation and the case went to the United States Supreme Court. In ruling on this question, the Court pointed out that a State owns the soil under tide waters in trust for the people, but that "[t]he interest of the people in the navigation of the wa-

---

[6] The Supreme Court of California has likewise held in quiet title actions to shoreland that private parties' ownership of the soil is "subject to the easement of the public for the public uses of navigation and commerce, and to the right of the state ... to enter upon and possess the same for the preservation and advancement of the public uses ...." *People* v. *California Fish Co.*, 166 Cal. 576, 599 (1913). *Marks* v. *Whitney*, 6 Cal. 3d 251, 261 (1971).

ters and in commerce over them may be improved in many instances by the erection of wharves, docks and piers therein, for which purpose the State may grant parcels of the submerged lands," and that "*so long as their disposition is made for such purpose,* no valid objections can be made to the grants" (emphasis supplied). *Illinois Cent. R.R.* v. *Illinois,* 146 U.S. 387, 452 (1892).

This requirement, that such lands be granted only for public purposes, was held by the Court to be central to the notion of governmental power. "The State can no more abdicate its trust over property in which the whole people are interested," the Court stated, "so as to leave them entirely under the use and control of private parties, except in the instance of parcels mentioned for the improvement of the navigation and use of the waters, or when parcels can be disposed of without impairment of the public interest in what remains, than it can abdicate its police powers in the administration of government and the preservation of the peace." *Id.* at 453. Holding that any grant of the kind at issue was necessarily revocable, it upheld the Illinois statute revoking the railroad's ownership.

This court has also held that legislative acts must be for a public purpose. *Opinion of the Justices,* 332 Mass. 769, 781-782 (1955). *Lowell* v. *Boston,* 111 Mass. 454, 460 (1873). It has defined a public use as "one the enjoyment and advantage of which are open to the public on equal terms. The circumstances may be such that only a relatively small portion of the inhabitants may participate in the benefits, but the use or service must be of such nature that in essence it affects them as a community and not merely as individuals." *Opinion of the Justices,* 297 Mass. 567, 571 (1937).

The public purpose served by the "Lewis Wharf" and other similar statutes was defined by this court as: "to promote trade and commerce by enabling and encouraging the owners of flats to build wharves, warehouses, and other structures thereon for the use and convenience of

those having occasion to resort to the ports and harbors
. . . ." *Bradford* v. *McQuesten, supra* at 82. The Legislature
expressed its intention to judge all requests for shoreland
grants by this standard of public use in an 1850 report of
the Joint Committee on Mercantile Affairs and Insur-
ance, saying that flats "should be granted, not for private
benefit, not for public economical result, but strictly for
the benefit of the harbors, where they are situated.
Whenever a petition is presented for leave to occupy
them, the single question should be, *as it always has been*,
— will the grant benefit the harbor? or, — will the in-
creased facilities, which will be given to commerce and
commercial enterprise, *compensate* for any slight
detriment of the harbor? . . . In other words, the flats in
each and every harbor of the State should be devoted
entirely to the benefit and improvement of that particu-
lar harbor." 1850 Sen. Doc. No. 119, at 4 (emphasis in
original).

At that time, it was probably inconceivable to the men
who sat in the Legislature or on the bench that the harbor
would ever cease to be much used for commercial ship-
ping, or that a wharf might be more profitable as a foun-
dation for private condominiums and pleasure boats than
as a facility serving public needs of commerce and trade.
They did not speculate on what should become of the land
granted to private proprietors to further development of
maritime commerce if that very commerce should cease,
because they did not envision it. But this court has held
before that where a corporation was granted, even irrevo-
cably, the use of certain previously public property for a
public purpose, there was an implied condition in the
grant that the company could not retain the granted loca-
tions without using them for the purpose for which they
were granted. *Boston Elevated Ry.* v. *Commonwealth*, 310
Mass. 528, 566 (1942). *Worcester* v. *Western R.R.*, 4 Met.
564, 566 (1842). See *New York Elec. Lines Co.* v. *Empire
City Subway Co.*, 235 U.S. 179, 194 (1914). This court has
also held that where the use of public or publicly-granted

land changes over time, the *Legislature* must approve the changed use. *Robbins* v. *Department of Pub. Works*, 355 Mass. 328, 330 (1969). *Gould* v. *Greylock Reservation Comm'n*, 350 Mass. 410, 419 (1966). See *Chase* v. *Sutton Mfg. Co.*, 4 Cush. 152, 169 (1849); *Commonwealth* v. *Charlestown*, 1 Pick. 180, 187 (1822).[7]

Neither party to this litigation has addressed the question whether the present use of the disputed property is a public use consonant with the purposes for which the land was granted. This question remains open after our opinion today. We do hold, however, that BWDC's title to the land in Area B is subject to that same public trust on which the Commonwealth originally held it, and that it may be used only for a purpose approved by the Legislature as a public use.

The essential import of this holding is that the land in question is not, like ordinary private land held in fee simple absolute, subject to development at the sole whim of the owner, but it is impressed with a public trust, which gives the public's representatives an interest and responsibility in its development. This concept is difficult to describe in language in complete harmony with the language of the law ordinarily applied to privately owned property. We are not dealing with the allocation of property rights between private individuals when we are concerned with a public resource such as Boston Harbor.

We believe that the formulation adopted by the Appeals Court, appropriately expresses the intention underlying the grant made by the Lewis Wharf statutes, and we endorse it. We therefore hold that the BWDC has title to its property in fee simple, but subject to the condition subsequent that it be used for the public purpose for which it was granted.[8]

---

[7] See also *State* v. *Cleveland & Pittsburgh R.R.*, 94 Ohio St. 61, 80 (1916), where the Ohio Supreme Court, in considering the railroad's claims to use of the land between the shore and the harbor line, stated, "The state as trustee for the public cannot by acquiescence abandon the trust property or enable a diversion of it to private ends different from the object for which the trust was created."

[8] We note a report that the Metropolitan District Commission has,

The theory underpinning our holding was well-expressed by professors Alfred E. McCordic and Wilson G. Crosby in their 1890 Harvard Law Review article, The Right of Access and the Right to Wharf Out to Navigable Water, 4 Harv. L. Rev. 14, 24 (1890). After reviewing the history of tidelands development, they conclude: "The State, however, grants these lands for a particular purpose; namely, to further its commercial interests depending upon navigation. It is not unreasonable, therefore, to say that the grant is upon condition that the land be used for no other purposes than those of the commerce marine. If the property is used for any other purpose, the State should have the privilege of entering and determining the riparian proprietor's estate."

The petitioner argues that conditions subsequent are generally disfavored in the law, and should only be recognized when expressed in language considerably sharper and less ambiguous than that at issue here. *Boston Consol. Gas Co.* v. *Oakes*, 279 Mass. 230, 236 (1932). *Clapp* v. *Wilder*, 176 Mass. 332, 337 (1900). *Rawson* v. *School Dist. in Uxbridge*, 7 Allen 125, 128 (1863). Goldstein, Rights of Entry and Possibilities of Reverter as Devices to Restrict the Use of Land, 54 Harv. L. Rev. 248, 250 (1940). This argument, although generally correct, ignores the sui generis nature of the Commonwealth's — and ultimately the public's — interest in shore property. This is an interest which transcends the ordinary rules of property law. For example, the twenty-year statute of limitations on actions by the Commonwealth for the recovery of land does not apply to "any property, right, title or interest of the commonwealth below high water mark or in the great ponds." G. L. c. 260, § 31. Earlier in this opinion, we have discussed at length the special nature of property rights

---

when conveying certain Commonwealth land, imposed just such a condition — that it be used for a stated public purpose. See 1968 House Doc. No. 87, at 5; 1974 House Doc. No. 6215, at 2-3.

to land along the shore. It is true, as the petitioner argues, that courts normally hesitate in placing conditions on conveyances of land which restrict the free alienability of that land. However, when we are concerned, as we are here, with the giving away by the State into private hands of an irreplaceable public resource, a different standard must control.

The petitioner finally contends that, even if the Lewis Wharf statutes did create a condition on its title to the land, the Commonwealth has lost the right to proceed against it for any breach of this condition on account of G. L. c. 260, § 31A. Therefore, it argues, the existence of any such condition is moot. This question was not squarely raised by the issue presented to the Appeals Court under Mass. R. A. P. 8 (d), that issue being "[w]hether the Land Court erred in finding that the petitioner obtained fee simple title . . . ." We have concluded, agreeing with the Appeals Court, that the petitioner does not have fee simple absolute title; therefore the judgment of the Land Court must be amended. Final resolution of the questions arising under G. L. c. 260, § 31A, must await further proceedings.

Whether G. L. c. 260, § 31A, which is basically a statute of limitations on the right to pursue actions arising from conditions placed on ownership of land before 1964, is applicable to this case is a complex question. The solution of the question requires not only the construction of the statute and its amendments, but also an analysis of the other statutes governing conditions on land, e.g., G. L. c. 184, § 23, and G. L. c. 184A, §§ 3, 5, and the study of a body of legislative history concerning these statutes. Although both parties allude to these matters in their briefs, neither party has argued them thoroughly. We do not believe we can make a final disposition of this question on the basis of the record now before us. The remarks which follow, therefore, are meant to be suggestive of the outlines of the issue, and not determinative of the result.

General Laws c. 184, § 23, basically unchanged since St. 1887, c. 418, sets up a general "thirty-year rule" for the existence of conditions or restrictions on land — i.e., the rule that such conditions, unlimited as to time, will expire after thirty years with the exception of certain specified categories. The condition subsequent at issue in this case is covered by two of the given exceptions: one, that the section does not apply to "conditions or restrictions existing on July sixteenth, eighteen hundred and eighty-seven", and two, that it does not apply to "those contained in a deed, grant or gift of the commonwealth . . . ." G. L. c. 184, § 23, as amended by St. 1969, c. 666, § 1. By St. 1956, c. 258, § 2, the Legislature enacted G. L. c. 260, § 31A, to further limit the viability of such conditions created before January 2, 1955. It denied parties the right to take action on any such conditions after January 1, 1964, unless before the latter date (a) the party having the right to retake possession of the land had already done so, and filed a certificate of entry in the registry of deeds, or (b) such party filed a prescribed type of notice of the condition in the registry of deeds.

The record before us does not address the question whether the Commonwealth had fulfilled either of these requirements. All the evidence that we have before us suggests that it did neither. Therefore, if we assume, without deciding, that it did neither, there would be a question whether G. L. c. 260, § 31A, bars the Commonwealth from pursuing any right of action against BWDC based on the condition subsequent that we today hold attaches to BWDC's title to the land.

As originally passed by the Legislature in 1956, § 31A (St. 1956, c. 258, § 2), applied "to all such rights whether or not the owner thereof is a corporation or a charity or a government or governmental subdivision . . . ." On its face, this language would appear to include the Commonwealth. In 1968, by c. 496, the Legislature amended § 31A to read: "[t]his section shall apply to all such rights whether or not the owner thereof is a corporation or a

charity or a government or governmental subdivision, *other than the commonwealth . . ."* (emphasis supplied). The dispute between the parties about this amendment is: whether the Legislature intended thereby to declare that § 31A barred the Commonwealth from pursuing such actions, so that between 1956 and 1968 (the period during which this petition for registration was originally filed) the Commonwealth had no actionable right of reentry or whether it intended to declare that the Commonwealth had been exempt from § 31A since 1956, and that the 1968 amendment merely made that intention more explicit.

The Legislature itself spoke directly to this question in St. 1974, c. 527, "An Act relative to period of limitation of restrictions affecting lands owned or conveyed by the Commonwealth." Concerned that "contrary to the legislative intent thereof, [the original § 31A] created the misapprehension that [it] applied to lands owned and conveyed by the commonwealth," the Legislature declared in unequivocal terms that § 31A "shall not be construed to apply to, and do[es] not apply to, reversionary interests upon fee simple determinables or fee simples subject to the right of entry or condition broken of the commonwealth, whether created before or after the effective date of the passage of this act, in lands owned and conveyed by the commonwealth, notwithstanding any lapse of time or the passage of any prior law." See also Report of the Committee on the Judiciary Relative to the Legislative Intent of the Accompanying Legislation, 1974 House Doc. No. 6215, at 2. Whether, and if so, how, this after-the-fact expression of legislative intent affects the rights of the parties we leave for them to argue in any further proceedings. In the present state of this case we do not reach BWDC's contention that § 31A so clearly forecloses the Commonwealth from pursuing a right of action against it for an alleged breach of the condition that the issue is moot.

We hold, as did the Appeals Court, that BWDC's ownership of the land in question is subject to the condition that it be used for a public purpose related to the "promot[ion of] trade and commerce by enabling and encouraging the owners of flats to build wharves, warehouses, and other structures thereon for the use and convenience of those having occasion to resort to the ports and harbors . . . ." *Bradford* v. *McQuesten*, 182 Mass. at 82. Whether BWDC's current use of the land is consistent with that public purpose, and if not, what the proper remedy might be, we leave for such further proceedings as the parties may deem appropriate or necessary.

*So ordered.*

BRAUCHER, J. (dissenting). I agree with the court that as an original question St. 1832, c. 102, might well have been read as a revocable license rather than a grant, as provided by St. 1869, c. 432, § 1, for subsequent legislation. I also agree that our past decisions have established that such statutes, before 1869, were grants rather than revocable licenses, and that we should stand by those decisions. *Fitchburg R.R.* v. *Boston & Me. R.R.*, 3 Cush. 58, 87 (1849), interpreted as deciding there was an "irrevocable grant" in Note, 9 Gray 503, 520 (1857). But I do not agree that the grant is subject to a condition not expressed in the statute.

I do not find in the record any indication that the existence of a condition was claimed or litigated in the Land Court. There the parties stipulated that the only issue was whether "the Petitioner obtained fee simple title to the soil beneath the fill pursuant to the legislative grants." The judge in his decision discussed the questions whether the words of the grant were limited to the wharf itself and whether the legislative acts constituted a grant rather than a license; he did not mention any claim that the grant was subject to a condition. The Common-

wealth's brief in the Appeals Court argued that the statutes gave only a license and that the petitioner's only title "was to the actual wharf itself to its lawful extension." Apparently the issue of a grant subject to an unexpressed condition was raised by the Appeals Court on its own initiative.

If the condition issue had been fully aired in the Land Court, in reviewing it I would start with the principle that the statute here in issue "operated as a legislative grant subject to the terms and conditions *therein set forth,* and not as a mere revocable license" (emphasis supplied). *Treasurer & Receiver Gen.* v. *Revere Sugar Refinery,* 247 Mass. 483, 489 (1924), and cases cited. Cf. *Bradford* v. *McQuesten,* 182 Mass. 80, 81 (1902) (grant subject to terms and conditions "expressed in it"). The only condition expressed in the 1832 statute requires that any part of the wharf constructed in the harbor channel be "built on piles" and be parallel with described lines; there is no suggestion that there has been a breach of that condition. The condition now in issue is defined by the court on the basis of verbal formulas in committee reports and judicial opinions first committed to writing many years after the grant.

The present decision leaves in limbo the ownership of the particular tract in litigation. The resulting uncertainty as to that tract may not be a matter of grave public concern, but we are told that there will be a similar mischievous effect on uncounted other parcels. In time the uncertainty may be alleviated by a broad interpretation of what uses are consistent with the "public purpose" embodied in the condition, or by the operation of G. L. c. 260, § 31A. Meanwhile, however, the present decision creates a clog on the alienability of land contrary to a public policy that has prevailed for centuries.

I would affirm the decision of the Land Court.