McHugh, J.
Presented to the Court through what amounts to a motion in limine is the question whether the Commonwealth, in this eminent domain proceeding, can be required to pay the plaintiff damages for taking land that, in one case, the Commonwealth owns in fee and, in another, plaintiffs use and occupy pursuant to licenses the Commonwealth granted to them long ago. In both cases, for the reasons that follow, the answer is a qualified yes.
The two relevant parcels are referred to by the parties as the Bridge Parcel and the River Parcel. The River Parcel is located between Industrial Park Way and the Charles River in Cambridge. The Bridge Parcel is located between Industrial Park Way and Charles-town Avenue, formerly the Prison Point Bridge. Both parcels are located below the high water line and both therefore consist of filled former tidelands. The Bridge Parcel is above the “100 rod line” and the River Parcel is located below that line.
Both parcels were filled years ago. The Bridge Parcel was filled in three stages. The first section was filled before 1868 legislation that thereafter regulated the filling of all lands in and around Boston Harbor. A second section was filled in 1878 under rights granted to plaintiff, or its predecessor,[1] under Harbor & Land Commissioner’s License No. 402. Compensation for *77 filling under that license was required and was presumably paid.[2] The license contained no expiration date and no explicit conditions. The rest of the Bridge Parcel was filled in approximately 1930 under rights granted to plaintiff by Department of Public Works (“DPW”) License No. 968. Again, the license contained no term and no conditions. It did require, however, payment of substantial compensation.
The River Parcel was filled in approximately 1930. Part of that parcel was filled under License No. 968, the license just described. The remainder was filled under DPW License No. 1079. License No. 1079 was issued in 1929, contained no term and no conditions, but required payment of approximately $14,000.
In order to fill the parcels, plaintiff was required to erect a bulkhead to restrain the tidal waters. After filling the area upland of the tidal waters, plaintiff erected a variety of improvements necessary for use of the property in its railroad business. The property has been used in that fashion ever since.
The Commonwealth has now taken the property for a new highway. Plaintiff seeks compensation, and, for several reasons, the Commonwealth contends that it is not required to pay any such compensation.
The Commonwealth’s arguments rest primarily on the historic treatment of tidal lands in Massachusetts. Before 1868, land above the so-called 100 rod line, i.e., land above mean low water or 100 rods seaward of mean high water, whichever was less, was owned by the owner of the adjacent upland property. Land below, or seaward, of mean low water or the 100 rod line, was owned by the Commonwealth and held in trust for the public. Boston Waterfront Development Corp. v. Commonwealth, 378 Mass. 629, 631-636 (1979).
In 1868, the Legislature enacted a series of statutes, now embodied in G.L.c. 91, designed to regulate the manner in which tidal lands surrounding Boston Harbor thereafter would be held. Until 1983, the relevant statute, now contained in G.L.c. 91, §21, provided, in essence, that licenses to fill issued by licensing authorities could be revoked if conditions the licenses contained were not met within a set period of time or if the Legislature acting at- its discretion revoked the license. If revoked in the latter fashion, however, and if the licensee had paid compensation for the license,
the rights and privileges for which [the license was granted] shall not . . . terminate or be revoked unless provision is made for repayment of such compensation.[3]
G.L.c. 91, §15, as appearing in St. 1927, c. 39, §1.[4]
Against that backdrop, the Commonwealth alleges that no compensation is due plaintiff because all of the land is held subject to licenses the Commonwealth has the power to revoke. The taking thus should be regarded, in the Commonwealth’s view, as a simple revocation of those licenses.
Things are not quite that simple. The licenses are revocable, not at the instance of some agent of the sovereign, but through the solemn and deliberate act of the sovereign’s representatives assembled in the General Court. Moreover, the governing statute makes the sovereign’s action ineffective unless and until provision is made for repayment of compensation the licensee paid in order to obtain, or operate under, the licenses the sovereign granted. There is no suggestion in the papers filed by the parties that any such provision for repayment was made in this case.
Unless and until the licenses are revoked in the fashion the statute permits and requires, they confer valuable property rights just as any other license does. To be sure, those property rights are subject to revocation if the proper procedures are followed and the possibility of revocation thus is a circumstance for the market to take into account and to consider when determining full and fair compensation for the taking. The possibility of revocation, however, is not a factor that extinguishes all rights to compensation.
The Commonwealth next alleges that, by virtue of the Supreme Judicial Court’s decision in Boston Waterfront Development Corporation v. Commonwealth, 378 Mass. 629 (1979), even if plaintiff is entitled to some compensation for the property or some part of the property, the portion of the River Parcel that lies seaward of the “100 rod” line is owned by the Commonwealth in fee and is held in trust by the Commonwealth for the public good. Accordingly, the Commonwealth asserts, no compensation surely is due for the Commonwealth’s “taking” of what it already owns in fee.
That argument has a surface appeal. The Boston Waterfront Development case, however, was concerned with improvements that occurred before the first licensing law was first passed in 1868. Improvements before 1868 were not subject to any licensing scheme. Here, all improvements plaintiff made to land seaward of the 100 rod line were subject to the 1868 licensing scheme and to the licensing schemes that followed.
By passing the 1868 legislation and by issuing licenses thereunder, the Commonwealth, pursuant to its obligation to hold lands in trust for the public, gave plaintiff the right to fill and use land below the 100 rod line until the license was revoked in accordance with the procedures outlined above. It is the unrevoked right to use the filled property in that fashion for which the plaintiff is entitled to compensation. So viewed, plaintiffs right in this case is no different than the right of every person who owns less than the entire fee to receive compensation for the value of his or her interest when the Commonwealth takes that interest. See generally e.g., Universal Container Corp. v. City of Cambridge, 361 Mass. 58 (1972).
Finally, the Commonwealth alleges that all of the licenses were granted for railroad purposes and that new licenses will be required before plaintiffs property can be put to any other use. Accordingly even if *78 plaintiff is entitled to some compensation, the Commonwealth argues, the amount of appropriate compensation should be determined by looking at the value of the property for use in railroading.
Again, I disagree. On their face, the licenses contain no such condition. To be sure, they were issued to individuals who were at the time engaged in operation of a railroad. But no necessary implication that the licenses were limited to railroading arises from that circumstance. At the time the licenses were issued, an extremely broad concept and definition of “public purpose” was in vogue. Indeed, the prevailing attitude was that all forms of development along the Harbor would have a beneficial impact on the commonweal by increasing the flow of commerce and thus the production of revenue to the benefit of all of the Commonwealth’s citizens. While maritime commerce, and facilities designed to allow that commerce to flourish, probably were utmost in the minds of the regulators, advancement of maritime commerce was not necessarily the only purpose for which licenses could be issued.
For all of the foregoing reasons, I am of the opinion that the general rule applicable in eminent domain cases applies in this case. The fact that the lands are not entirely held in fee and are subject to licenses is something for the jury to take into account in assessing damages. The jury is entitled to value the property for any potential use that maximizes its value in the marketplace including uses that require relief from zoning and other restrictions provided that there is a basis in the evidence for a reasonable probability that the licensing or zoning relief can be obtained. See Skyline Homes, Inc. v. Commonwealth, 362 Mass. 684, 687-88 (1972); Joly v. City of Salem, 276 Mass. 297, 305-06 (1931); Salem Country Club. v. Peabody Redevelopment Auth., 21 Mass.App.Ct. 433, 435-37 (1986).

No issue in this case turns on the precise identity of the licensee. For that reason, I treat all licenses as if they had been issued to plaintiff instead of to some predecessor.

No one has suggested that compensation was not paid. If actual payment of compensation is material to any issue in the case, appropriate proof can be presented at trial.

By St. 1983, c. 589, §25, the section was rewritten so that, with a subsequent amendment, it now reads
Revocation by the general court of licenses issued after January 1st, nineteen hundred and eighty-four shall be treated as a taking of real property requiring payment of just compensation in accordance with the provisions of chapter seventy-nine for valuable structures, fillings, enclosures, uses or other improvements, built, made or continued in compliance with said authorization or license. Except as provided herein, the grant of a license pursuant to this chapter shall not convey a property right, nor authorize any injury to property or invasion of rights of others.
There is no suggestion that the 1983 amendment was, or could be, retroactive.

The provision for compensation first was inserted in the statutory scheme by St. 1874, c.284, §1, effective May 29, 1874.