EDWARD S. BRADFORD *vs.* ALBERT METCALF.
SAME *vs.* JOSEPH STONE.

Suffolk.   January 28, 1904. — February 26, 1904.

Present: KNOWLTON, C. J., LATHROP, BARKER, HAMMOND, & BRALEY, JJ.

*Flats.   Mystic River.   Tide Water.*

St. 1893, c. 334, extending the time within which the proprietors of the lands, wharves and flats lying between Johnson's wharf and Elm Street on Mystic River could complete the improvements authorized by special laws of the Commonwealth, gave those proprietors an extension of the right to fill their flats without making compensation for the displacement of tide water under Pub. Sts. c. 19, § 14.

TWO ACTIONS OF CONTRACT by the treasurer of the Commonwealth under Pub. Sts. c. 19, § 14, for compensation for tide water displaced by the defendants in filling portions of the flats respectively belonging to them, lying in front of the upland between Medford Street and the shore of Mystic River. Writs dated respectively December 6, 1901, and March 11, 1902.

In the Superior Court the cases were heard upon agreed facts, and judgment was entered for the defendant in each case. The plaintiff appealed.

*F. H. Nash,* Assistant Attorney General, for the plaintiff, submitted a brief.

*C. F. Jenney & S. Robinson,* for the defendants.

KNOWLTON, C. J. These two cases present the same questions and they may be considered together. Each of the defendants filled certain flats in the harbor near the channel of Mystic River, under a license from the harbor and land commissioners, issued in accordance with the provisions of Pub. Sts. c. 19, §§ 12, 13. The treasurer of the Commonwealth brought these suits to recover the money due for the displacement of tide water caused by the filling, and the agreed facts show that he is entitled to recover, unless the defendants had a right to fill the flats without payment, under certain special statutes which relate to the improvements to be made in the harbor by the Mystic River Corporation. The licenses were granted without prejudice to the rights of either of the parties.

The first of these statutes was the St. of 1852, c. 105, which incorporated the Mystic River Corporation, whose members were to be the city of Charlestown and such other proprietors of land and flats situated in Charlestown, bounding on the southerly side of Mystic River between Johnson's wharf and Chelsea bridge, as should vote to accept the act at a meeting called for that purpose. Among these corporators were the predecessors in title of the defendants. The statute gave the corporation the right to fill flats and make improvements within certain specified lines, upon the condition that the regulation and control of certain other designated flats belonging to individuals and corporations should be surrendered to the Commonwealth before any construction authorized by the act should be commenced. This act was duly accepted, and a code of by-laws was adopted, and officers were chosen in accordance with its provisions. A by-law provided that the value of the grant should be " estimated and fixed by the directors and the amount thereof distributed among the grantees according to their several interests in the same." By the St. 1855, c. 481, this statute was repealed, except that part of it which incorporated the company, and a new grant was made which gave authority to fill the same flats and others, with additional rights and upon additional and changed conditions. The act was not to take effect unless accepted by the corporation within ninety days, but it was duly accepted.

Previously to the year 1852 there had been attempts to obtain legislation which had not resulted satisfactorily, and in anticipa-

tion of the application for the grant contained in St. 1852, c. 105, parties interested, owners and representatives of estates bordering on Mystic River, entered into an agreement under seal, whereby they undertook to bind themselves in regard to the distribution and use of the benefits to be obtained by the act of incorporation, giving to the owners of a certain part of the shore the benefits of the grant opposite their respective estates, to be divided among them in proportion to their ownership of the shore. A similar arrangement was made in regard to the owners of estates on another part of the shore. The benefits upon another part were to be the property of all the owners who were parties to the contract, to be divided among them in proportion to the length of their respective estates upon the line of the river bank between Malden bridge and Chelsea bridge. It also was agreed that they should all waive all claims for damages, and that the required excavations opposite estates whose owners were to hold in severalty were to be made by the respective owners, and all others by the whole company.

It is plain that this contract did not bind the corporation afterwards created. It could not affect in any way the legal rights of the corporation, or of its members in their action as corporators in the exercise of rights given them by the statute. The corporation could not even ratify the agreement in terms, for at the time of the agreement there was no corporation in existence for which any one could assume to make such a contract. *Abbott* v. *Hapgood,* 150 Mass. 248. *In re Northumberland Avenue Hotel Co.* 33 Ch. D. 16. *Howard* v. *Patent Ivory Manuf. Co.* 38 Ch. D. 156. *In re Empress Engineering Co.* 16 Ch. D. 125. *Melhado* v. *Porto Alegre Railway,* L. R. 9 C. P. 503. But as to matters within the powers of the corporation under its charter, it could enter into a new contract of a similar character. After the passage of the St. 1855, c. 481, the directors employed an engineer to designate the lines of the corporate property, and appointed a committee to ascertain the interest of the different members of the corporation in it. The report of the committee showed that the preliminary agreement between the associates had been examined, estimates by an engineer had been made, and a valuation put upon the flats, and they had been divided among the different classes of owners according to

the agreement. The report was adopted, and all shore owners received certificates of stock in accordance with the original plan. " It thereby appears that the middle shore owners, [among whom were the defendants' predecessors in title] by reason of the terms of the agreement of January 16, 1852, having received the grant opposite their estates in severalty, received a less interest in the corporate property on account thereof." " From 1852 to the present time the middle and upper shore owners from time to time have filled, some to the outer line, and some to less extent, each his own flats, acting by virtue of said acts, and have held possession of said flats in accordance with the agreement of January, 1852, and said votes of said corporation."

The time allowed to the corporation to build their improvements was extended from time to time by the Legislature, until everything was done that pertained to that portion of the property which was not connected with the estates set off to individual stockholders in severalty. See Sts. 1859, c. 19 ; 1867, c. 150; 1878, c. 5; 1887, c. 278; 1889, c. 25 ; 1891, c. 240. By the St. 1887, c. 278, the Mystic River Corporation was authorized to transfer its property, rights, privileges and franchises, to the Boston and Lowell Railroad Company, subject to all the conditions, limitations and obligations which then pertained to the ownership of the Mystic River corporation, and the property has since been held by the Boston and Lowell Railroad Company and the Boston and Maine Railroad.

The effect of the attempt of the corporation to give the benefits of its grant on a part of the shore to individual members of the corporation, to be held in severalty, if considered by itself alone, is very questionable. It seems that the directors treated the preliminary agreement as binding upon the corporation, and its officers and members. Action in intended execution of the agreement as a contract binding on the corporation would be of no effect. No conveyances were made from the corporation to anybody at that time, and the only title of these defendants and others owning the shore near their lands, rests upon the action of the corporation in accepting the report of the committee, and treating them as owners in severalty of their land, and of a part of the benefits granted by the charter. Probably

it was in the power of the corporation to sell and convey parts of its property with the appurtenant rights, subject to the conditions imposed by its charter; although it hardly could relieve itself of the effect of these conditions and its obligations, upon its title to the remainder of the property. Its right to make such sales was recognized by the St. 1884, c. 183. The defendants and their predecessors in title having been in possession of this property, claiming it and its appurtenant rights and privileges, from 1855 to 1893, the Legislature, by the St. 1893, c. 334, § 1, made this provision : "The time heretofore allowed for the completion of the improvements by the proprietors of the lands, wharves and flats lying between Johnson's wharf and Elm Street on Mystic River, authorized by the special laws of this Commonwealth, is, with the rights and subject to the requirements of such laws, extended ten years from the passage hereof." This is an express recognition of the rights of these defendants and others, acquired by virtue of the Sts. 1852, c. 105, and 1855, c. 481, and the action of the corporation and the shore owners under them. It may be assumed in favor of the plaintiff, that if these defendants had no rights whatever, legal or equitable, in the privileges granted by these acts, this later statute did not create such rights. *Salters* v. *Tobias,* 3 Paige, 338. *Van Norman* v. *Jackson Circuit Judge,* 45 Mich. 204. *Bingham* v. *Supervisors of Winona County,* 8 Minn. 441. As against the Commonwealth, after the passage of the St. 1867, c. 275, (R. L. c. 202, § 30,) a title by disseisin could not be acquired in property below high water mark. See *Nichols* v. *Boston,* 98 Mass. 39. But these rights had been granted by the Commonwealth to the Mystic River Corporation, had been attached to the lands, and had been held by the defendants and their predecessors as their own property under a claim of right for more than forty years without interference by the corporation. As against this corporation, property rights could be acquired by disseisin and adverse possession. Under these circumstances the Legislature might well treat the grant as in force against the Commonwealth, and treat the defendants as the rightful owners of the benefits as against the Mystic River Corporation. We are of opinion that the St. 1893, c. 334, was an extension of the right to fill the defendants' lands with-

out paying for the displacement of tide water, which was originally granted to the Mystic River Corporation, and that this extension, granted in terms to the defendants and others who were in possession, inured to their benefit in such a way as to leave them outside of the Pub. Sts. c. 19, § 14. Even though they had not a title to these rights which was technically perfect, the rights had long been treated as existing in connection with their ownership of their land, and, as against the corporation, they had a title by disseisin to the upland to which the rights were appurtenant. There were also strong equitable considerations in support of their claim of ownership. At least this last act of the Legislature should be treated as a release and a grant to them by implication of all rights which the Commonwealth might assert as to their filling these flats under authority of the earlier statutes, and subject to the requirements of those statutes.

*Judgments affirmed.*