TRIO ALGARVIO, INC. *vs.* DEPARTMENT OF ENVIRONMENTAL
PROGRESTION & others.[1]

No. 00-P-319.

Suffolk. February 13, 2002. - November 12, 2002.

Present: RAPOZA, COWIN, & DOERFER, JJ.

Further appellate review granted, 438 Mass. 1106 (2003).

*Harbors. Real Property,* Wharf, Grant, License, Restrictions. *License.*

Discussion of the history of wharfing statutes and early Supreme Judicial
   Court cases interpreting those statutes. [427-431]
This court concluded that the requirement of payment of tidewater displace-
   ment and occupation fees for a prior owner's unauthorized placement of
   fill below the low water mark of a river, as a condition to the issuance of
   licenses by the Department of Environmental Protection to the current
   owner (the operator of a fish processing plant), was in derogation of the
   grant effected by St. 1806, c. 18 (a special act authorizing the current
   owner's predecessor to extend wharves into the river), and hence beyond
   the power of public officers to demand as a condition of granting the
   license. [431-434]

CIVIL ACTION commenced in the Superior Court Department on
December 16, 1998.

The case was heard by *John C. Cratsley,* J.

*Richard A. Nylen, Jr.,* for the plaintiff.

*Maria Makredes,* Assistant Attorney General, for the
defendants.

COWIN, J. Trio Algarvio, Inc. (Trio), appeals from a judgment
rendered by a Superior Court judge pursuant to G. L. c. 30A,
§ 14, upholding the assessment by the Department of Environ-
mental Protection (department) under G. L. c. 91, §§ 21 and 22,
of tidewater displacement and occupation fees for a prior
owner's unauthorized placement of fill below the low water
mark in the Acushnet River in New Bedford. The dispute

---

[1]The Commissioner of Environmental Protection; Commonwealth of
Massachusetts.

requires that we address the meaning of nineteenth century "wharfing" statutes as well as the significance attributed to them by decisions of the Supreme Judicial Court in the first quarter of the twentieth century. On the strength of *Bradford* v. *McQuesten*, 182 Mass. 80 (1902); *Bradford* v. *Metcalf*, 185 Mass. 205 (1904); and *Treasurer & Recr. Gen.* v. *Revere Sugar Refinery*, 247 Mass. 483 (1924), there being nothing thereafter that calls the holdings of these cases into question, we reverse.

1. *Facts and prior proceedings.* The material aspects of the history of this case are not disputed. By chapter 18 of the Acts of 1806, the Legislature provided, in relevant part, that "the owners and proprietors of lots of land adjoining Accushnett [*sic*] River, in the town of New Bedford, in the county of Bristol, between Clark's Point, so called, and the head of navigation in said river, their heirs and assigns, shall be and hereby are authorized and empowered to erect, continue and maintain wharves parallel with the line of their several lots, as they abut upon said river; said wharves to extend to the channel of said river, if the owners of said lots think proper; and each owner of said lot shall have authority to provide docks or erect wharves as aforesaid on the aforesaid extended portion of his said lot, in such way and manner as he may think proper, not exceeding the limits of said channel of said river." The statute authorized the filling and construction in question below the low water mark, thereby permitting the owner to invade property which was otherwise owned outright by the Commonwealth. See the Colonial Ordinance of 1641-1647. The owner of the property that is the subject of this case, then one John A. Parker, and his successors, in fact constructed and maintained wharves pursuant to this authorization, filling portions of the river in the process.

In 1866, the Legislature for the first time required that persons who displace tidewater[2] by filling tidewater flats or placing structures in the tidewater compensate the Commonwealth either by excavating elsewhere to replace the tidewater that had been lost or by paying a fee to defray the expense incurred by the government to do the work itself. St. 1866, c. 149. In 1869, the Legislature adopted a licensing system whereby such activities in tidal waters required prior governmental approval and were

[2]The Acushnet River is a tidal river that flows into Buzzards Bay.

performed not pursuant to legislative grants of authority (such as St. 1806, c. 18), but rather in accordance with revocable licenses issued by executive officials. St. 1869, c. 432. These statutes were the precursors of the present regulatory system embodied in Chapter 91 of the General Laws. Trio's predecessors subsequently obtained five licenses between 1905 and 1944, pursuant to which they engaged in further operations which displaced more tidewater in the Acushnet River. Sometime after 1944, a prior owner placed additional fill in the river without acquiring a license.

Trio acquired the site in 1982 and has there operated a fish processing plant and an aquaculture facility. In 1995, Trio applied to the department under G. L. c. 91, § 14, for licenses for its existing fish processing plant; an addition to the plant for aquaculture use; two pipes for the discharge of water from the aquaculture plant into New Bedford harbor; and the previously unauthorized fill placed in the tidelands by the prior owner sometime after 1944.[3] In connection with the license for the previously unauthorized fill, the department assessed Trio a tidewater displacement fee of $6,461, G. L. c. 91, § 21, and a fee for occupation of Commonwealth tidelands of $45,926, G. L. c. 91, § 22.

Trio appealed these assessments to the department's office of administrative appeals, which affirmed both of them. Trio then filed a complaint for judicial review in the Superior Court, G. L. c. 30A, § 14, asserting in essence that St. 1806, c. 18, the special act that authorized John A. Parker and his successors to extend wharves into the river, had conferred upon the owners of the site title to the property. Accordingly, the owners were in effect filling their own property rather than Commonwealth tidelands, and the assessment provisions of G. L. c. 91, §§ 21 and 22, did not apply. The judge rejected this proposition, concluding that §§ 21 and 22, and the accompanying regulations adopted by the department, 310 Code Mass. Regs. §§ 9.02 et seq., did apply to Trio, and upheld the assessments.

2. *Discussion.* The history of the wharfing statutes, as well as their origin in English history, is set forth comprehensively in

---

[3]The licenses for the existing fish processing plant, the addition, and the two discharge pipes are not at issue in this proceeding.

*Boston Waterfront Dev. Corp.* v. *Commonwealth*, 378 Mass. 629, 631-641 (1979),[4] and need not be repeated here. Suffice it to say that the early wharfing statutes, i.e., those enacted prior to 1869,[5] were adopted for the purpose of encouraging private entrepreneurs to develop facilities to enhance the use of navigable waters for commercial purposes. *Bradford* v. *McQuesten*, 182 Mass. at 82 (*McQuesten*). As an inducement to these waterfront owners to undertake the investment in the kind of development that would inure to the public benefit, the Commonwealth transferred interests in the property on which the developments would take place, property previously owned by the Commonwealth for the benefit of all of its citizens.

"[W]e point out that there is nothing in the actual language of these statutes making a grant of the title to land." *Boston Waterfront Dev. Corp.* v. *Commonwealth*, 378 Mass. at 639 (*Boston Waterfront*). The 1806 special act, on which Trio relies, authorizes construction and maintenance of wharves in the tidelands, but does not expressly convey any interest in the tidelands to the abutting owners. Nevertheless, the Supreme Judicial Court has stated that "a decision resting on the bare words of the statutes would ignore over 100 years of judicial history interpreting similar grants," *id.* at 639-640, and has concluded that the pre-1869 wharfing statutes were indeed grants of some kind. *Id.* at 641. In deciding exactly what interests were conveyed by these statutes, the Supreme Judicial Court held, as had this court, that the interest was one in fee simple, "but subject to the condition subsequent that it be used for the public purpose for which it was granted." *Id.* at 649.[6] In other words, St. 1806, c. 18, vested in Trio's predecessor a fee simple

---

[4]See *Boston Waterfront Dev. Corp.* v. *Commonwealth*, 6 Mass. App. Ct. 214, 215-225 (1978), where the subject is also explored.

[5]These include, among hundreds of others, St. 1835, c. 76 (Lewis Wharf); St. 1840, c. 16 (Rowe's Wharf); and St. 1852, c. 105 (Mystic River), as well as St. 1806, c. 18 (Acushnet River), at issue here.

[6]In certain early decisions, the Supreme Judicial Court, in construing St. 1806, c. 18, specifically held that the act constituted a grant of "an interest in the soil" and a "possessory title" without reaching the question whether the owner would be subject to regulations promulgated after 1869. *Hastings* v. *Grimshaw*, 153 Mass. 497, 501 (1891), quoting from *Hamlin* v. *Pairpoint*

interest in the tidelands in question, subject to the understanding that that title could be lost in the event that the owner ceased using the property for the wharves or other purposes for which the grant was made. Even in the event of the cessation of such use, title would not revert to the Commonwealth automatically, but instead would revert only pursuant to judicial proceedings or a legislative declaration of forfeiture. *Treasurer & Recr. Gen.* v. *Revere Sugar Refinery*, 247 Mass. at 490 (*Revere Sugar Refinery*).

Following the adoption of tidelands water displacement fees in 1866, St. 1866, c. 149, and a licensing system in 1869, St. 1869, c. 432, the Commonwealth attempted, through the Treasurer and Receiver General, to impose fees on the owners of the wharves constructed pursuant to the pre-1869 special acts. In three decisions between 1902 and 1924, the Supreme Judicial Court concluded that such fees could not be charged to those who acted pursuant to the legislative grants. Thus, in *Mc-Questen*, construing St. 1851, c. 26, authorizing the extension of the wharf of one Donald McKay into the harbor at East Boston, the court stated that "[i]t would seem plain that the [C]ommonwealth intended to part with all its rights except so far as contained in the conditions on which the grant was made." 182 Mass. at 82. The court continued: "The only matter really affecting the defendant's rights is the claim that is made upon him for compensation for the tide water displaced. That demand, we think, is clearly in derogation of the grant formerly made, and cannot be sustained." *Id.* at 83.

An effort by the same Treasurer to impose displacement fees for the filling of certain harbor flats near the channel of the Mystic River pursuant to St. 1852, c. 105, and St. 1855, c. 481, met the same fate. Ruling on the significance of St. 1893, c. 334, the Supreme Judicial Court concluded that the statute "was an extension of the right to fill the defendants' lands without paying for the displacement of tide water." *Bradford*

*Mfg. Co.*, 141 Mass. 51, 57 (1886). See *Fitchburg R.R. Co.* v. *Boston & Maine R.R.*, 3 Cush. 58, 87 (1849); *Haskell* v. *New Bedford*, 108 Mass. 208, 216 (1871).

v. *Metcalf*, 185 Mass. at 209-210 (*Metcalf*).[7] Statute 1855, c. 481, was again at issue in 1924 when the court ruled that the special act "operated as a legislative grant subject to the terms and conditions therein set forth, and not as a mere revocable license." *Revere Sugar Refinery*, 247 Mass. at 489. When officials thereafter sought to assess fees under the 1869 licensing program, the court held that "[t]he insertion in each license of the clause requiring payment for displacement of tidewater was in derogation of the grant by the Commonwealth and hence beyond the power of the public officers to demand as a condition of granting the license." *Id.* at 491.

We are not persuaded by the department's effort to distinguish St. 1806, c. 18, under which Trio seeks relief, from those statutes at issue in the *McQuesten*, *Metcalf*, and *Revere Sugar Refinery* decisions. The purpose of the statutes was the same. They were among "hundreds of [pre-1869] acts authorizing the construction and maintenance of wharves on flats in Boston Harbor and elsewhere." *Boston Waterfront Dev. Corp.* v. *Commonwealth*, 6 Mass. App. Ct. 214, 218 (1978). "The Commonwealth's attempt to distinguish that statute [St. 1806, c. 18] from the Lewis Wharf statutes is not persuasive. Though the language used in the 1806 statute differs from that used in the Lewis Wharf statutes, we see no difference, in substance, and the Commonwealth has pointed to none, between the reservations of rights in those statutes." *Id.* at 223-224.

The question, therefore, is whether the *Boston Waterfront* decision of the Supreme Judicial Court, relied on by the department as well as by the Superior Court judge, alters the holdings of the prior cases to the effect that displacement fees[8] could not be imposed on those who constructed in tidelands pursuant to pre-1869 legislative grants. *Boston Waterfront* came about by

---

[7]We see no significance in the fact that *Metcalf* dealt with an *extension* of the right to fill the defendants' lands. The statute extending the right was required because prior authorizations to build improvements had lapsed. No such temporal limitations apply in the case of St. 1806, c. 18, the special act presently at issue.

[8]While referring expressly to displacement fees, G. L. ,c. 91, § 21, the reasoning of these decisions makes them applicable to occupation fees, G. L. c. 91, § 22, as well.

virtue of a petition by the Commercial and Lewis Wharf Corporation under G. L. c. 185, § 1, to register a title in fee simple to a portion of the soil beneath the fill placed in Boston Harbor pursuant to the so-called Lewis Wharf statutes, specifically St. 1832, c. 102; St. 1834, c. 115; St. 1835, c. 76; and St. 1840, c. 18. *Boston Waterfront*, 378 Mass. at 630-631. Agreeing with prior decisions that the statutes constituted grants rather than revocable licenses, *id.* at 641, the court reasoned that "where a corporation was granted, even irrevocably, the use of certain previously public property for a public purpose, there was an implied condition in the grant that the company could not retain the granted locations without using them for the purpose for which they were granted." *Id.* at 648. Accordingly, the court concluded that the interest that had been granted was a fee simple interest subject to a condition subsequent, specifically, that the property continue to be used in a manner consistent with the grant. *Id.* at 649.

Apparently reading *Boston Waterfront* as impliedly overruling the *McQuesten*, *Metcalf*, and *Revere Sugar Refinery* decisions, the judge applied the department's regulation providing that land seaward of the historic low water mark shall be presumed to be Commonwealth tidelands (and thus subject to displacement and occupation fees) unless it is established that the land in question is "unconditionally free of any proprietary interest in the Commonwealth." 310 Code Mass. Regs. § 9.02. The judge then determined that Trio had not sustained its burden of proving that the Commonwealth had no proprietary interest because "the legislative grant was subject to terms and conditions and . . . Trio's interest is a fee simple subject to condition subsequent not a fee simple absolute. Therefore, Trio's property does not qualify for the exemption from the Department's definition of Commonwealth tidelands."

The problem, as we see it, is that the Legislature, the department, and ultimately the judge appear to have relied on *Boston Waterfront* as a declaration that *McQuesten*, *Metcalf*, and *Revere Sugar Refinery* no longer accurately state the law; that the pre-1869 grants in some way retained a proprietary interest in the Commonwealth; and that the retained interest justifies imposition of displacement and occupation fees with respect to the

activities authorized by the early grants. Thus, following *Boston Waterfront*, the Legislature defined "Commonwealth tidelands" in part by the terms used in that decision, specifically as including tidelands held by "grant of the [C]ommonwealth subject to an express or implied condition subsequent that it be used for a public purpose." G. L. c. 91, § 1, as amended by St. 1983, c. 589, § 21. The department then reproduced that definition in its regulation, 310 Code Mass. Regs. § 9.02, adding a presumption that everything seaward of the low water mark would be deemed Commonwealth tidelands unless the owner could establish conclusively "that, notwithstanding the Boston Waterfront decision of the Supreme Judicial Court, such tidelands are unconditionally free of any proprietary interest in the Commonwealth." *Ibid.* The judge applied this approach in the present case.

We are not convinced that the regulatory authority that the judge enforced has been rendered permissible by the cases we have discussed. The *Boston Waterfront* decision does not address the issue of imposition of displacement or occupation fees, nor was that issue germane to the litigation. *Boston Waterfront* was a registration case in the Land Court devoted solely to a determination of the title claimed by the owners and their successors under the Lewis Wharf statutes. The determination of title was not undertaken as a means of generating a conclusion regarding whether fees could be assessed under subsequent statutes. Indeed, the decision cites *McQuesten* three times and *Revere Sugar Refinery* once without suggesting that the holdings of those cases are suspect. *Boston Waterfront*, 378 Mass. at 641, 648, 654.

Furthermore, we do not view the *Boston Waterfront* decision as bringing about a sea change, so to speak, in how we are to consider the nature of the property interest granted by the pre-1869 special acts. The opinion characterized past decisions as "inconsistent in their treatment of the relationship between wharfing privileges and ownership of the soil under the wharf." *Id.* at 641. However, the prior decisions, without definitively identifying the kind of interest conveyed, did consistently indicate that the grant was subject to conditions imposed for the public's benefit. "It would seem plain that the [C]ommonwealth

intended to part with all its rights *except so far as contained in the conditions on which the grant was made." McQuesten*, 182 Mass. at 82 (emphasis supplied). "Probably it was in the power of the corporation to sell and convey parts of its property, with the appurtenant rights, *subject to the conditions imposed by its charter; although it hardly could relieve itself of the effect of these conditions, and its obligations, upon its title to the remainder of the property." Metcalf*, 185 Mass. at 208-209 (emphasis supplied). "The terms of St. 1855, c. 481, operated as a legislative grant *subject to the terms and conditions therein set forth*, and not as a mere revocable license." *Revere Sugar Refinery*, 247 Mass. at 489 (emphasis supplied). Thus, while *Boston Waterfront* may have defined the nature of the titles conveyed by the pre-1869 legislative grants more precisely, the decision did not alter in any fundamental way the understanding that the grants contained conditions favoring the public that could not be ignored.

The motion judge correctly analyzed the thrust of G. L. c. 91, §§ 1, 21, and 22, and of the accompanying regulations, 310 Code Mass. Regs. §§ 9.02 et seq., that fees are now to be paid for private work in "Commonwealth tidelands," including "tidelands held by the [C]ommonwealth . . . or by another party by license or grant of the [C]ommonwealth subject to an express or implied condition subsequent that it be used for a public purpose." G. L. c. 91, § 1. We believe, however, that the judge incorrectly construed the *Boston Waterfront* decision as indicating that the Commonwealth had retained a "proprietary" interest in the pre-1869 granted tidelands, and that therefore the system of fees adopted after 1869 could lawfully be applied to the earlier grants. We do not read the decision in that way. At the time of the purported assessment of fees in this case, Trio was in compliance with the terms of the 1806 grant and the Commonwealth had no ownership interest in the property. The Commonwealth would acquire an ownership interest only in the event that Trio failed to fulfill the condition subsequent, i.e., failed to maintain the public use for which the grant was made. Even then, reversion to Commonwealth ownership would require a judicial decree or legislative enactment. *Revere Sugar Refinery*, 247 Mass. at 490.

We see no justification for the view that *Boston Waterfront* revisited the issue whether the pre-1869 wharfing statutes protected the owners from subsequent imposition of displacement fees. The opinion did not consider the question. If the Supreme Judicial Court intended to overrule three of its own decisions on the subject, it certainly did so with great subtlety. We construe *Boston Waterfront* as addressed to a different issue, leaving the holdings of *McQuesten,* 182 Mass. at 83, *Metcalf,* 185 Mass. at 204-210, and *Revere Sugar Refinery,* 247 Mass. at 491, undisturbed. We conclude that the rights of the beneficiaries of the pre-1869 grants cannot now be revised, even by legislative action.

We observe that the question whether displacement and occupation fees may now lawfully be imposed in light of the grant effected by St. 1806, c. 18, is the only issue before us, and thus the only issue on which we rule. Nothing herein should be construed as bearing upon the Commonwealth's power to regulate, by a licensing system or otherwise, structures which are placed in tidelands. Indeed, Trio never challenged the requirement that its structures be licensed; it applied for the required licenses, and this litigation ensued only when the department assessed fees in connection with the license sought by Trio for its predecessor's unauthorized fill.[9] Thus we hold only that the requirement of payment of displacement and occupation fees as a condition to the issuance of the license in question here remains "in derogation of the grant by the Commonwealth and hence beyond the power of the public officers to demand as a condition of granting the license." *Revere Sugar Refinery,* 247 Mass. at 491.

3. *Disposition.* The lower court's ruling in favor of the department is based on an error of law, G. L. c. 30A, § 14(7)(*c*), and the judgment is reversed. Because the material facts are not disputed, and because application of the law as set forth in *McQuesten, Metcalf,* and *Revere Sugar Refinery* entitles Trio to

---

[9]That the fill was unauthorized likewise does not alter our ruling that displacement and occupation fees could not have been imposed with respect to it. We do not address what, if any, powers the department may have to deal with such unauthorized activities, that issue not being before us. We note, however, that G. L. c. 91, § 23, provides sanctions for such activities "if a license is required" as they "shall be considered a public nuisance."

judgment in its favor, we do not order a remand for further proceedings, but instead direct that judgment for Trio be entered consistent with this opinion.

*So ordered.*