94                                   440 Mass. 94 (2003)

Trio Algarvio, Inc. *v.* Commissioner of the Department of Environmental Protection.

## TRIO ALGARVIO, INC. *vs.* COMMISSIONER OF THE DEPARTMENT OF ENVIRONMENTAL PROTECTION.

Suffolk. May 5, 2003. - September 9, 2003.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, SOSMAN, & CORDY, JJ.

*Harbors. Real Property,* Wharf, Littoral property, Grant, License, Restrictions. *License.*

Discussion of the history of wharfing statutes. [97-101]
This court concluded that the requirement of payment of tidewater displacement fees for a prior owner's unauthorized placement of fill below the low water mark of a river, as a condition to the issuance of a license by the Department of Environmental Protection (department) to the current owner (the operator of a fish processing plant), was not in derogation of the grant formerly made by St. 1806, c. 18 (a special act authorizing the current owner's predecessor to extend wharves into the river), which reserved to the Commonwealth the right to impose later conditions or requirements as necessary to protect navigation [101-105]; however, as to the department's assessment of occupation fees as a condition to the issuance of the license, the propriety of which depended on the present status of the current owner's title, this court remanded the matter to the department for further findings on that issue [105-107].

CIVIL ACTION commenced in the Superior Court Department on December 16, 1998.

The case was heard by *John C. Cratsley,* J.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*James R. Milkey,* Assistant Attorney General, for the defendant.

*Richard A. Nylen, Jr.,* for the plaintiff.

The following submitted briefs for amici curiae:

*John A. Pike* for Conservation Law Foundation.

*Eric W. Wodlinger & Sarah Hunt Broughel* for 245 Summer Street 121A Limited Partnership.

*Michael E. Malamut* for New England Legal Foundation.

MARSHALL, C.J. Some two centuries ago, the General Court enacted a statute previously of little consequence except to the owners of land adjoining the Acushnet River in New Bedford. The statute, one of several hundred "wharfing statutes" enacted in the late Eighteenth and early Nineteenth Centuries, permitted the littoral owners of the property to "erect, continue and maintain, wharves parallel with [its] several lots" beyond the low water mark of the river. St. 1806, c. 18, § 1. In the succeeding decades, wharves and piers were erected on the submerged tidelands, which were filled incrementally as authorized by various licenses granted by the Commonwealth to successive owners of the property.

In 1995, a present owner, the plaintiff, Trio Algarvio, Inc. (Trio), applied to the Department of Environmental Protection (department) under its amnesty program, 310 Code Mass. Regs. § 9.28 (1994), for a license pertaining to a one-half acre of tidelands that had been filled by one of Trio's predecessors without authorization from the department or its predecessor agencies. The license was granted, but the department assessed tidelands development fees against Trio (specifically, tidewater displacement fees and tidelands occupation fees). Trio's challenge to those fees now requires us to resolve a potential conflict between the department's waterways regulatory scheme and all littoral landowners in the Commonwealth.

We conclude that the terms of the original wharfing statute at issue in this case permit the department to assess tidewater displacement fees against Trio. That statute and our holding are consistent with the Commonwealth's ancient obligation to protect "the easement of the public for the purposes of navigation . . . wherever the tide ebbs and flows." *Boston Waterfront Dev. Corp.* v. *Commonwealth*, 378 Mass. 629, 645 (1979). We further conclude that the department is not necessarily entitled to assess tidelands occupation fees against Trio: resolution of that issue requires further proceedings to determine the present status of Trio's title.[1]

1. *Background.* The relevant facts are not in dispute. The

---

[1] We acknowledge the amicus briefs filed by Conservation Law Foundation, New England Legal Foundation, and 245 Summer Street 121A Limited Partnership.

property at issue lies adjacent to the tidal portions of the Acushnet River in New Bedford, which was once submerged tidelands beneath the river. In 1905, 1910, 1928, 1932 and 1944, Trio's predecessors obtained tidelands licenses for various portions of the property that have been filled, in connection with which they were assessed tidewater displacement and tidelands occupation fees. Trio's predecessors paid all of the assessed fees, without contest. This appeal involves only a one-half acre portion of the property filled by one of Trio's predecessors sometime between the date the last license issued in 1944 and the date Trio purchased the property in 1982.

Trio currently operates a fish processing plant and aquaculture business on the property. In 1995, Trio applied to the department for a license pursuant to G. L. c. 91 (the waterways law) permitting, among other things, its use of the approximately one-half acre of formerly submerged tidelands. The department issued the license. However, it also assessed Trio two fees: a $6,461 displacement fee pursuant to G. L. c. 91, § 21,[2] for tidewater displaced by the fill; and a $45,926 tidelands occupation fee pursuant to G. L. c. 91, § 22,[3] for Trio's occupation of Commonwealth tidelands by way of the fill.

Trio appealed from these assessments and requested an adjudicatory hearing. An administrative law judge affirmed the assessments. Trio then filed a complaint for judicial review in the Superior Court, asserting that St. 1806, c. 18, the relevant wharfing statute, exempted it from both of the assessed fees.

---

[2]The statute provides in pertinent part: "The amount of tidewater displaced by any structure below high water mark, or any filling of flats, shall be ascertained by the department, which shall require the person, his heirs or assignees who are responsible for such displacement to make compensation therefor by excavating under its direction, between high and low water mark in some part of the same harbor a basin for a quantity of water equal to that displaced; or by paying to the commonwealth, in lieu of such excavation, an amount assessed by the department, or by improving the harbor in any other manner satisfactory to the department." G. L. c. 91, § 21.

[3]The statute provides in pertinent part: "If authority or a license is granted by the general court or by the department to a person to build a wharf or other structure upon, or to fill or otherwise occupy, land in tide water . . . he shall pay to the commonwealth such compensation for the rights granted in any land the title to which is in the commonwealth as shall be determined pursuant to regulations of the department." G. L. c. 91, § 22.

The Superior Court judge rejected Trio's argument and upheld the assessments.

The Appeals Court reversed, evidently constrained by three cases decided by this court in the first quarter of the Twentieth Century, all of which held that displacement fees could not be assessed against individuals who developed tidelands under the specific terms of certain similar wharfing statutes. See *Treasurer & Receiver Gen.* v. *Revere Sugar Refinery*, 247 Mass. 483 (1924); *Bradford* v. *Metcalf*, 185 Mass. 205 (1904); *Bradford* v. *McQuesten*, 182 Mass. 80 (1902).[4] We granted the department's application for further appellate review, noting that the scope of review should "include, but not be limited to, the effect, if any, of the public trust doctrine . . . on the assessment of the [department's] displacement fees or tideland occupation fees."

2. *Discussion.* The public trust doctrine is an age-old concept with ancient roots. See *Boston Waterfront Dev. Corp.* v. *Commonwealth, supra* at 631 (doctrine has origin in Roman law). In Massachusetts, it is expressed as the government's obligation to protect the public's interest in, among other things, navigation of the Commonwealth's waterways. *Id.* at 645. All tidelands below high water mark are subject to this trust, which may be extinguished only, in the case of tidal flats, by lawful filling, or, in the case of submerged land, by express legislative authorization. See *Opinions of the Justices*, 383 Mass. 895, 902-903 (1981); *Boston Waterfront Dev. Corp.* v. *Commonwealth, supra* at 645, 646.

Echoes of the doctrine can be traced throughout the development of Massachusetts tidelands law in, for example, the Legislature's regulation of waterways beginning in 1866; the early Twentieth Century wharfing statute cases; and, indeed, the specific wharfing statute at issue in this case. We, therefore, begin with a review of that law.[5] Under English common law, ownership of the shore below high water mark was vested in

---

[4]The Appeals Court noted that "[w]hile referring expressly to displacement fees, G. L. c. 91, § 21, the reasoning of these decisions makes them applicable to occupation fees, G. L. c. 91, § 22, as well." *Trio Algarvio, Inc.* v. *Department of Envtl. Protection*, 56 Mass. App. Ct. 425, 430 n.8 (2002).

[5]Because an extensive review of Massachusetts tidelands law is contained in *Boston Waterfront Dev. Corp.* v. *Commonwealth*, 378 Mass. 629, 631-639 (1979), only the most salient aspects will be repeated here.

the Crown, but held in such a way as to prevent the transfer of this critical common resource into private hands. *Boston Waterfront Dev. Corp.* v. *Commonwealth, supra* at 632. See *Commonwealth* v. *Alger*, 7 Cush. 53, 65-68 (1851). While early settlers in Massachusetts carried this tradition with them to the colony, they eventually broke with it, acting out of perceived necessity:

> "When our ancestors emigrated to this country, their first settlements were on harbors or arms of the sea; and commerce was among the earliest objects of their attention. For the purposes of commerce, wharves erected below high water mark were necessary. But the colony was not able to build them at the public expense. To induce persons to erect them, the common law of *England* was altered by an ordinance, providing that the proprietor of land adjoining on the sea or salt water, shall hold to low water mark, where the tide does not ebb more than one hundred rods, but not more where the tide ebbs to a greater distance" (emphasis in original).

*Boston Waterfront Dev. Corp.* v. *Commonwealth, supra* at 635, quoting *Storer* v. *Freeman*, 6 Mass. 435, 437 (1810) (Parsons, C.J.). Thus, the Colonial Ordinance of 1641-1647 granted certain ownership rights to Massachusetts tidelands from high water mark to low water mark to the upland owners. *Boston Waterfront Dev. Corp.* v. *Commonwealth, supra* at 636-637. However, this ownership was qualified and "always had strings attached." *Id.* at 637. "It is true individuals may acquire the right by grant or prescription . . . to occupy flats with wharves and stores, but this is always on condition that the navigation of the stream be not materially impaired . . . ." *Id.* at 637, quoting *Kean* v. *Stetson*, 5 Pick. 492, 495 (1827).

In the late Eighteenth and Nineteenth Centuries, Massachusetts took a further step away from established English common law by enacting hundreds of so-called wharfing statutes, which granted private ownership in certain tidelands below low water mark. Like the Colonial Ordinance, the statutes "were adopted for the purpose of encouraging private entrepreneurs to develop facilities to enhance the use of navigable waters for commercial purposes." *Trio Algarvio, Inc.* v. *Department of*

*Envtl. Protection*, 56 Mass. App. Ct. 425, 428 (2002).[6] Some of these statutes, such as the one at issue here, explicitly recognized the Commonwealth's continued interest in protecting the navigability of the relevant waterway for public use, despite the transfer of title to private hands. See St. 1806, c. 18, § 2 ("the said General Court shall have a right, notwithstanding this act, to make such provisions respecting the navigation of said river, and the right of taking [shell or other] fish as they may think the public interest requires").

By the mid-Nineteenth Century, private development spurred by the Colonial Ordinance and various wharfing statutes became rapid and chaotic. *Boston Waterfront Dev. Corp.* v. *Commonwealth, supra* at 640. Concerns mounted that unregulated filling and development of the waterfront would eventually ruin that critical resource. Primary among these concerns was the displacement of tidewater.

Beginning as early as 1837, a series of commissioners, appointed to study the impact of development on Boston Harbor, warned the Legislature that the building of wharves and placing of fill in the harbor obstructed the flow of the tides. 1837 Sen. Doc. No. 47. When tidewater was displaced, sediment built up in the channels. *Id.* at 22. If allowed to continue unchecked, the commissioners cautioned, the sediment buildup would result in the destruction of the harbor as a commercially navigable resource. *Id.* To avoid this dire consequence, the commissioners eventually proposed that any grants permitting private parties to fill tidal flats include, among other things, a requirement of excavation elsewhere in the harbor as "consideration." 1850 Sen. Doc. No. 3, at 42-43. As they later explained:

> "If individuals or corporations are to be benefitted, the state may stipulate that, as a consideration for the grant, they shall make certain other improvements in the same harbor. In other words, the flats in each and every harbor of the State should be devoted entirely to the benefit and improvement of that particular harbor."

---

[6]"The wharfing statutes are themselves but one example of a larger class of statutes in which the Massachusetts Legislature granted property and privileges to private turnpike companies, canal companies, bridge and dam building companies, etc. as a means of stimulating private investment in economic development." *Boston Waterfront Dev. Corp.* v. *Commonwealth, supra* at 638.

1850 Sen. Doc. No. 119, at 4. The commissioners emphasized that "[t]hese precautions appear to the commissioners to be indispensably necessary to the safety of the harbor, and the Legislature would be false to the trust reposed in them, to make a grant without securing the performance of these, or similar duties, in the most ample manner." 1850 Sen. Doc. No. 3, at 4.

In 1866, the Legislature acted on the commissioners' recommendations. St. 1866, c. 149. To protect the economic viability of the Commonwealth's waterways, the Legislature created a permanent board of harbor commissioners and authorized it to "remove unauthorized encroachments and causes of every kind which are liable to interfere with the full navigation of said harbors, or in any way injure their channels, or cause any reduction of their tide-waters." St. 1866, c. 149, §§ 1, 2. The Legislature then required that "[a]ll persons that have been or may be authorized by the legislature to build over tide-waters," who had not "already begun such work," give written notice and submit plans to the commissioners of any proposed development below high water mark.[7] *Id.* at § 4. According to its plain terms, therefore, the statute applied to all private owners of tidelands below high water mark, whether pursuant to the Colonial Ordinance or the various wharfing statutes.

In the same paragraph of St. 1866, c. 149, § 4 — therefore, reaching all private owners of tidelands — the Legislature also required private parties to "make compensation" for tidewater displacement, "either by excavating in some part of the same harbor where the work is performed . . . or by paying in lieu of performing the work of dredging to restore the displaced tidewater a sufficient sum of money." *Id.* All such displacement

---

[7] The Legislature's choice to regulate all new development by private owners of land below high water mark, whether under the Colonial Ordinance or the wharfing statutes, is consistent with the law of the time, which held that "title of private proprietors to flats is subject, until they are built upon, to legislative control for the public welfare, for the protection of harbors and navigation." J.J. Whittlesey, Law of the Seashore, Tidewaters and Great Ponds 58 (1932) (collecting early cases). It is now recognized that the public's interest in such land may only be extinguished if explicitly surrendered by the Legislature. *Opinions of the Justices*, 383 Mass. 895, 905 (1981).

fees were to be "reserved as a compensation fund for the harbor where such compensation is to be made."[8]

The Legislature did not establish an occupation fee until 1874, when it enacted a law to "secure to the Commonwealth the value of its property in lands flowed by tide-water." St. 1874, c. 284. Specifically, the statute provided in pertinent part that:

> "Whenever any authority or license is hereafter granted . . . to any person or corporation . . . to fill or otherwise occupy land in tide-water lying below the line of low-water mark[9] . . . such person or corporation shall pay into the treasury of the Commonwealth, before the work authorized or licensed is begun, such compensation for the rights and privileges granted in such land as shall be determined . . . to be just and equitable . . . ."

*Id.* at § 1. From the plain language of the statute, it is clear that the word "compensation" is being used to mean payment for the right privately to develop and use tidelands belonging to the Commonwealth. By contrast, the same word is used in the earlier displacement fee statute to mean the restoration of a public resource. St. 1866, c. 149, § 4 (requiring private parties to "make compensation" for tidewater displaced by private projects, whether by excavating elsewhere in harbor, paying fee, or otherwise improving harbor).

Trio argues that it is exempted from both displacement and occupation fees, assessed pursuant to the current G. L. c. 91, §§ 21 and 22, by virtue of the property rights granted to it under the relevant wharfing statute, St. 1806, c. 18. In support of its argument, it relies primarily on three cases decided by this court in the early Twentieth Century, which state, albeit in

---

[8]To this day, displacement fees and, presumably, occupation fees generated by work in Boston Harbor are still paid into the Port of Boston Fund, and are used to "operate, maintain, repair and preserve the property in Boston harbor in the control of the department." G. L. c. 91, § 6. Since approximately 1925, however, displacement and occupation fees generated by work in all other Massachusetts tidelands are paid into the General Fund. G. L. c. 91, § 24. See St. 1925 c. 196, § 1.

[9]Traditionally, the tidelands below low water mark belonged to the Commonwealth, absent an applicable wharfing statute. *Boston Waterfront Dev. Corp.* v. *Commonwealth, supra* at 634, 638.

somewhat conclusory fashion, that requiring landowners to pay
a displacement fee for work authorized by a wharfing statute is
"clearly in derogation of the grant formerly made and cannot
be sustained." *Bradford* v. *McQuesten*, 182 Mass. 80, 83 (1902).
See *Treasurer & Receiver Gen.* v. *Revere Sugar Refinery*, 247
Mass. 483 (1924); *Bradford* v. *Metcalf*, 185 Mass. 205 (1904).
Trio's claim founders, however, by failing to analyze the obvi-
ous question posed by these cases: what was "the grant formerly
made"?

In two of the cases, the relevant wharfing statute itself
contained some means of compensating for displaced tidewater,
thus arguably making a fee redundant. For example, in *Treasurer
& Receiver Gen.* v. *Revere Sugar Refinery*, *supra* at 488, the
statute required the landowner to excavate certain other tidal
flats, which the Legislature had explicitly recognized as an ac-
ceptable alternative to paying a displacement fee. See, e.g., St.
1866, c. 149. In *Bradford* v. *Metcalf*, *supra* at 206, the statute
required that "regulation and control of certain other designated
flats belonging to individuals and corporations should be sur-
rendered to the Commonwealth."[10] Presumably, this require-
ment permitted the Commonwealth to improve the harbor in
some other fashion, even if it was simply to transfer ownership
of the flats to the public. At the time the case was decided,
improvement of the harbor affected by development was also a
recognized alternative to paying a displacement fee. See, e.g.,
St. 1866, c. 149. Therefore, both the *Revere Sugar* and *Metcalf*
cases can be distinguished from the present case because the
landowners in question had already "compensated" the Com-
monwealth for the tidewater displaced by their development
under the specific terms of the relevant wharfing statute. Any
additional compensation, in the form of a displacement fee,
would be "in derogation of" the original grant. *Treasurer &
Receiver Gen.* v. *Revere Sugar Refinery*, *supra* at 491.[11]

A similar element is also present in *Bradford* v. *McQuesten*,

---

[10]There were apparently "additional and changed conditions" that were
later imposed by the Legislature, but the court does not state what they were.
*Bradford* v. *Metcalf*, 185 Mass. 205, 206 (1904).

[11]Moreover, as noted by the department, in both *Treasurer & Receiver Gen.*
v. *Revere Sugar Refinery*, 247 Mass. 483, 489 (1924) and *Bradford* v. *Metcalf*,
*supra* at 208, the authority granted by each specific wharfing statute was

*supra.* In discussing the relevant statute, the court noted that "[t]he interests of the Commonwealth in navigation are carefully protected by limiting the extension [of the wharf] to the harbor line, and by requiring that below low water the wharf shall be built on piles which shall be certain distances apart." *Id.* at 82. Thus, the court explicitly acknowledged that the Commonwealth had a right to protect the navigability of its waterways, but determined that the conditions imposed by the statute were sufficient.

Here, the relevant wharfing statute does not mandate compensation for displaced tidewater in any fashion, certainly not in one of the three alternative means recognized by the Legislature: excavation, payment of a fee, or improvement of the harbor in some manner acceptable to the Commonwealth.[12] St. 1806, c. 18. Rather, it explicitly reserves to the Legislature the right to revisit the impact of development authorized by the statute on the navigability of the Acushnet River:

> "[I]f at any time hereafter, it shall be made to appear to the satisfaction of the General Court of the Commonwealth of Massachusetts, that the erection, maintaining, or continuing said wharves or docks, mentioned in the first section of this act, operates any obstruction to the navigation of said river . . . the said General Court shall have a right, notwithstanding this act, to make such provisions respecting the navigation of said river . . . as they may think the public interest warrants."

*Id.* at § 2. Thus, the grant formerly made to Trio's predecessor reserves to the Commonwealth the right to impose later conditions or requirements as necessary to protect navigation. Displacement fees, later imposed to ensure navigability, are therefore not in derogation of that grant.

Even if the statute did not expressly reserve this right, we conclude that the public trust doctrine would permit the department to assess Trio displacement fees. The premise in *Bradford* v. *McQuesten, supra,* that the relevant wharfing statute granted

---

legislatively extended after the generally applicable displacement fee legislation had been enacted.

[12]The only limit contained in the statute is a prohibition against building out beyond "said channel of said river." St. 1806, c. 18, § 1.

the private landowner a right to fill certain tidelands free from having to pay any kind of a fee at any time, is incorrect. It ignores the Legislature's 1866 determination that additional protections — aside from those enumerated in the applicable wharfing statutes, i.e., displacement fees — were necessary to protect the navigability of the Commonwealth's waterways. See St. 1866, c. 149; *Commonwealth* v. *Alger*, 7 Cush. 53, 95 (1851) (Shaw, C.J.) (rejecting challenge to harbor line, first enacted in 1837 and prohibiting wharves past certain point even where defendant had right to build under Colonial Ordinance of 1641-1647, and stating "the [L]egislature has power, by a general law affecting all riparian proprietors on the same line of shore equally and alike, to make reasonable regulations, declaring the public right [of navigation], and providing for its preservation by reasonable restraints"). Trio's fill — on formerly submerged land, not subject to any appropriate license — displaced the flow of the tide and adversely affected the navigability of the Acushnet River, which is protected by the public trust doctrine.

This conclusion does not, as Trio and some amici fear, upset the allegedly settled expectation of littoral landowners that they are exempt from displacement fees. To the contrary, the record evidence demonstrates that landowners, at least in New Bedford and presumably throughout the Commonwealth, actually hold the opposite expectation. Both Trio's predecessors-in-interest and other littoral landowners in New Bedford have paid the fees "several hundred" times, despite the existence of the relevant wharfing statute. In fact, Trio's predecessors in interest obtained licenses and paid fees for various projects on the property five times in the last century, apparently without contest. This pattern of conduct reflects an understanding and acceptance of the historical purpose of displacement fees: to compensate for tidewater displacement caused by private development and maintain the navigability of the harbor for the public good, as and when the development occurs.

Moreover, if we were to accept Trio's argument that it, and similarly situated landowners, are exempt from displacement fees, we would essentially invalidate the statute. As discussed above, G. L. c. 91, § 21, requires the payment of such fees for each and every structure built below high water mark. If, as the

440 Mass. 94 (2003) 105

Trio Algarvio, Inc. *v.* Commissioner of the Department of Environmental Protection.

Appeals Court held, *Trio Algarvio, Inc.* v. *Department of Envtl. Protection,* 56 Mass. App. Ct. 425, 434 (2002), Trio is exempt from the fees based on the rights conferred by its wharfing statute to tidelands below low water mark, then any landowner who owns tidelands below high water mark pursuant to the Colonial Ordinance of 1641-1647 is also exempt. The rights conferred by the two grants are virtually identical, as are the purposes for which the grants were made. *Boston Waterfront Dev. Corp.* v. *Commonwealth, supra* at 637, 638. Thus, G. L. c. 91, § 21, would be inapplicable to all privately held tidelands and the exception would swallow the rule. Such a result would conflict directly with the clear intent and purpose of G. L. c. 91, § 21, which furthers the Commonwealth's obligation to keep its waterfront open and navigable for the public benefit.

The department's assessment of occupation fees, however, may have been "in derogation" of Trio's grant. From their inception, occupation fees were designed, in the words of the early statute, to "secure to the commonwealth the value of its property in lands flowed by tide-water." St. 1874, c. 284. As the department concedes, the fees were originally applicable when a party sought to occupy or fill "land in tide-water lying below the line of low-water mark not exceeding one hundred rods from high-water mark." *Id.* Such land was traditionally owned by the Commonwealth, absent a relevant wharfing statute, as the drafters of the legislation would have been well aware.[13] See *Commonwealth* v. *Alger, supra* at 67 (Colonial Ordinance of 1641-1647 limited private ownership rights to "the low water mark, where the sea doth not ebb above a hundred rods, and not more wheresoever it ebbs further"); St. 1874, c. 284 (title of statute referred to Commonwealth's retaining "value of *its* property" [emphasis added]).

The 1866 establishment of a licensing scheme and the 1874 enactment of occupation fees represented a significant break

---

[13]We agree with the department that in codifying St. 1874, c. 284, § 1, the Legislature did not change its meaning by substituting the phrase "where the title to such land is in the commonwealth" for "land in tide-water lying below the line of low-water mark not exceeding one hundred rods from high-water mark." Pub. St. 1882, c. 19, § 16. The two phrases meant the same thing.

from past practice. Instead of granting title to Massachusetts tidelands in fee simple subject to a condition subsequent, as this court determined was done under the various wharfing statutes, *Boston Waterfront Dev. Corp.* v. *Commonwealth, supra* at 649, the Legislature issued revocable licenses for the use of its tidelands and charged fees for the privilege of occupying it. As Trio notes, the Legislature carefully stated that nothing in its new licensing scheme "shall have any effect whatever on the construction of grants heretofore made by the Commonwealth." St. 1869, c. 432, § 4.

According to the history and purpose of occupation fees, therefore, title mattered. If the entity seeking a license to fill or occupy certain tidelands was the beneficiary of a legislative grant giving title to it, the fees presumably did not apply. If the entity was not such a beneficiary and did not have title in the land, the fees presumably did apply.

In *Boston Waterfront Dev. Corp.* v. *Commonwealth, supra* at 649, the court defined the nature of the title held by wharfing statute beneficiaries. While the court acknowledged that the various wharfing statutes granted littoral landowners fee simple title to certain tidelands below low water mark, the fee was not absolute. *Id.* Rather, it was "subject to that same public trust on which the Commonwealth originally held it," and may be used "only for a purpose approved by the Legislature as a public use." *Id.* If it is used in some other manner, the Commonwealth has "the privilege of entering and determining the riparian proprietor's estate." *Id.* at 650, quoting McCordic, The Right of Access and the Right to Wharf Out to Navigable Water, 4 Harv. L. Rev. 14, 24 (1890).

Following the decision in *Boston Waterfront Dev. Corp.* v. *Commonwealth, supra*, the Legislature changed the definition of "Commonwealth tidelands" in G. L. c. 91, § 1, to include "tidelands held by the commonwealth in trust for the benefit of the public *or held by another party by license or grant of the commonwealth subject to an express or implied condition subsequent that it be used for a public purpose*" (emphasis

added).[14] St. 1983, c. 589, § 21. It then made occupation fees applicable to all "commonwealth tidelands."[15] G. L. c. 91, § 22. The department's regulations contain an exception for tidelands that "are unconditionally free of any proprietary interest in the Commonwealth." 310 Code Mass. Regs. § 9.02 (1994). See *Opinions of the Justices*, 383 Mass. 895, 902 (1981) ("the Legislature has the power to transfer or relinquish the Commonwealth's and the public's interests in tidelands within the Commonwealth"). Thus, even after the *Boston Waterfront* decision and the Legislature's subsequent action, title still matters in assessing occupation fees.

The current status of Trio's title was not decided by the administrative law judge, who determined that it was inappropriate to focus on the "fee interest in the land and who presently owns that interest." The status of Trio's title is a complicated question and must be decided with the benefit of a full record, not present here. Therefore, we remand this limited issue to the department, so that the parties may develop such a record and have the benefit of an administrative law judge's expertise.

3. *Conclusion.* We affirm so much of the Superior Court judgment as upheld the department's assessment of displacement fees against Trio. As to the assessment of occupation fees, we vacate so much of the judgment as upheld the assessment of those fees, and remand the matter to the Superior Court with instructions to remand it to the department for further proceedings consistent with this opinion.

*So ordered.*

---

[14]The department's previous definition of "Commonwealth tidelands" stated that the term "shall not mean any tidelands which have been conveyed by the Commonwealth." 310 Code Mass. Regs. § 9.04(16) (1979).

[15]Trio has not challenged this change in the law on constitutional grounds, arguing only that it was "in derogation" of its grant based on the holdings in the three early Twentieth Century wharfing statute cases, *Treasurer & Receiver Gen.* v. *Revere Sugar Refinery*, 247 Mass. 483 (1924); *Bradford* v. *Metcalf*, 185 Mass. 205 (1904); and *Bradford* v. *McQuesten*, 182 Mass. 80 (1902). Thus, it has waived any constitutional argument it may have had.